# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| STACEE LYNN CHIVERS,<br><br>               Plaintiff,<br>v.<br><br>STEVE REAVES *et al.*,<br><br>               Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 1:13-cv-00171<br><br>District Judge Jill N. Parrish |

This action arises from an armed standoff between law enforcement and Plaintiff's fiancé, Aaron Collier, which concluded with Collier's death by a self-inflicted gunshot wound. Plaintiff's complaint presents nineteen causes of action under federal and state law against twenty-five defendants, including law enforcement officials from Ogden City, Weber County, and the State of Utah. While the complaint makes little effort to distinguish which claims are directed at which of the many defendants, the essence of Plaintiff's claims is this: During the standoff, police handcuffed her, detained her in a police cruiser, transported her to a police station for additional questioning, and breached her home without a warrant. All this, Plaintiff alleges, was done unlawfully.

Now before the Court are the following motions: Plaintiff's Motion for Partial Summary Judgment Against Home Search Defendants (ECF No. 201), Plaintiff's Motion for Partial Summary Judgment Against False Arrest Defendants (ECF No. 206), Ogden City Defendants' Cross Motion for Summary Judgment (ECF No. 238), Weber County Defendants' Cross Motions for Summary Judgment (ECF Nos. 235, 244), Defendants Bryce Weir and Armando Perez's Cross Motion for Summary Judgment (ECF No. 245), State Defendants' Motion for Summary

Judgment (ECF No. 220), and Weber County Defendants' Motion to Dismiss Takings Claims (ECF No. 227). For the reasons below, the Court denies Plaintiff's motions and grants Defendants' motions.

## I.    BACKGROUND[1]

In the freezing pre-dawn hours of November 11, 2012, Plaintiff Stacee Lynn Chivers returned to her Ogden home after a night of drinking. Accompanying her were her fiancé, Aaron Collier, and two friends, Michael Lansky and Dezi Martinez.

Collier was severely intoxicated and behaving erratically. Once inside, he fought first with Lansky and then with Plaintiff when she intervened. Plaintiff attempted to call the police, but Collier took her phone and smashed it. When Plaintiff tried to retrieve her phone, Collier grabbed her and pushed her against a wall. Lansky and Martinez then distracted Collier, and Plaintiff managed to take Collier's phone, leave the home, and call 911. She told police dispatch that Collier was uncharacteristically aggressive—yelling and fighting. While Plaintiff was still on the line, Collier came up behind her and snatched the phone from her hand. The operator heard Plaintiff say "Leave me alone!" just before the call terminated. The time was 2:24 a.m.

Six minutes later, Ogden Police Department Officers Bennett and Caygle (who are not named in the complaint) responded to Plaintiff's 911 call. Plaintiff let the officers into her home and told them Collier was in the basement. As the officers approached the stairs to the basement, they heard a gun racking. Moments later, Collier ran up the stairs, firing at the officers repeatedly

---

[1] There is relatively little dispute over the material facts necessary to resolve these motions. However, the facts are extensive. The facts recited below largely follow Plaintiff's version of events. Facts that deviate from Plaintiff's version of events arise from uncontroverted evidence in the record. Uncontroverted video evidence covers large sections of the events at issue and provides the basis for much of the factual matter in this opinion regarding Plaintiff's false arrest claims. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (instructing courts to refrain from adopting a party's "visible fiction" when uncontroverted video evidence is available). Additional evidence regarding Plaintiff's excessive force and warrantless entry claims is largely drawn from Plaintiff's own submitted exhibits.

with a .40 caliber handgun. The officers drew their weapons, returned fire, and retreated outside, where they set up a perimeter facing the front door. Plaintiff and the two unarmed guests also left the home. In the exchange, Collier fired seven rounds, and the officers fired approximately eight. Neither officer was injured. Collier, on the other hand, had been shot in the leg and remained inside.

At 2:32 a.m., a notice of "SHOTS FIRED" went out over the dispatch radio system, requesting immediate assistance to the officers' location. Less than a minute later, the dispatch radio system alerted responding officers that there was "ONE GUNMAN IN THE BASEMENT."

Trooper Brandon Whitehead of the Utah Highway Patrol was on patrol in the area when he heard the "SHOTS FIRED" alert and the request for backup. He arrived on the scene around 2:34 a.m., retrieved a rifle from the trunk of his cruiser, and moved toward the house. Defendant Whitehead saw Plaintiff and Lansky kneeling or crouching near the front yard. Sergeant Steve Reaves of Ogden Police, who had since arrived on scene, shouted to Defendant Whitehead, "Get these people secured! I don't know what their involvement is!" Defendant Whitehead repeatedly instructed Plaintiff and Lansky to "get on the ground, both of you" and to go "face down." Plaintiff did not comply with the order to go prone. Instead, she remained kneeling on the ground, sobbing. Defendant Whitehead approached Plaintiff and said "Put your hands behind your back, ma'am." Defendant Whitehead then turned Plaintiff around, forced her face-down onto her stomach, and applied pressure to her back as he brought her hands behind her back and clicked the handcuffs on her wrists. [2] He then told her to "stand up for me, stand up," lifted her to

---

[2] When deposed, Plaintiff could not identify how this pressure was applied, but she said that the pressure was sufficient to keep her on the ground while Defendant Whitehead placed her in handcuffs. Defendant Whitehead testified that he did not force Plaintiff to the ground or apply any pressure to her back as he placed her in handcuffs.

her feet, and walked her to his cruiser. As Defendant Whitehead placed Plaintiff inside, she protested that she had not done anything wrong and asked "Is everyone OK?" Defendant Whitehead responded, "I have no idea." Defendant Whitehead and another officer then secured Lansky in handcuffs and placed him in another cruiser. Leaving Plaintiff in the cruiser, Defendant Whitehead took up a position near the other officers outside Plaintiff's home. The time was approximately 2:36 a.m., and Plaintiff sat in the cruiser for the next twenty-four minutes, handcuffed and alone.

While Plaintiff sat in the cruiser, Lieutenant Jeffrey Pledger, commander of the Ogden Metro SWAT Team, was alerted to the standoff brewing with Collier. Upon request from Lieutenant Will Cragun of Ogden City Police, who was already on the scene, Defendant Pledger activated the SWAT team members.

Around 2:50 a.m., an officer retrieved Defendant Whitehead's keys, opened the door to his cruiser, and removed Plaintiff's handcuffs. He and Plaintiff had the following conversation:

> **Plaintiff:** Help me, please! I didn't do anything wrong.
> **Officer:** I know, I know, Stacee. Stacee, right?
> **Plaintiff:** Yes.
> **Officer:** OK, I'm gonna take these cuffs off of you, OK?
> **Plaintiff:** These cuffs are killing me; I don't know why I'm locked up back here.
> **Officer:** OK, look, all we did it was [sic] we didn't know what was going on, OK?
> **Plaintiff:** [whimpers]
> **Officer:** Now that everything's straightened out, we're gonna get you out of here, OK?
> **Plaintiff:** I know, but do you have my dogs? Are my dogs OK?
> **Officer:** How many dogs do you have?

---

Nevertheless, he does not appear to dispute Plaintiff's characterization of events for purposes of summary judgment. Referring to Plaintiff's testimony regarding the arrest, Defendant Whitehead's briefing states as follows:

[T]o be clear, there are no material disputes of fact [regarding the initial detention] . . . . Even if the facts are construed totally as Stacee Chivers has testified . . . , Trooper Whitehead exhibited a great amount of restraint and did not use excessive force or violate Ms. Chivers' rights.

ECF No. 261, at 4–5. Accordingly, the Court considers these facts as undisputed for purposes of this decision.

> **Plaintiff:** Two little Shih Tzus; I just [inaudible] them running down the
> street.
> **Officer:** One Shih Tzu is sticking around, kay? I don't know where the
> other one went.

Plaintiff responded with an inaudible phrase and some sobbing. The conversation paused for a moment and then resumed when the officer returned with one of Plaintiff's dogs:

> **Officer:** Kay, Stacee? Here. I need you to calm down, OK? [inaudible]
> just need to grab some information from you, OK? Kay, yeah, this is the
> one that I seen around [sic].
> **Plaintiff:** His name is Willie.
> **Officer:** Willie? C'mere, Willie, c'mon.
> **Plaintiff:** Willie, can you come here?
> **Officer:** C'mere, c'mere.

The dog then joined Plaintiff in the back seat of the cruiser. The officer informed Plaintiff that all of her guests were safely outside the home but that Collier was still in the basement. He asked Plaintiff for basic information on Collier and whether there were any more weapons in the home. He then asked Plaintiff to draw a diagram of her home to orient officers once they entered. Plaintiff complied, and for several minutes, she explained to the officer the layout of her home, including the entrances and exits, the upstairs bedrooms, the bathrooms, the kitchen, the dining room, the basement, and "where the first shots went off." When asked where Collier might be hiding, Plaintiff exclaimed, "I don't know why he'd hide! I don't even understand what's going on in his brain." Plaintiff told the officer that Collier was behaving uncharacteristically and was intoxicated. As the conversation ended, the officer said "OK, just hang out here, OK?" Then he closed the door.

Defendant Pledger, commander of the SWAT Team, arrived on-scene at approximately 3:23 a.m. and established tactical command. After speaking with officers already on the scene, Defendant Pledger learned that Collier was alone inside the home. He also learned that Collier had called a friend and said he "would commit suicide." Defendant Pledger testified that, based

on his initial understanding of the situation, he was concerned "that we had a person who was clearly intent on firing a weapon deliberately at police officers and may do so again."

Under Defendant Pledger's orders, arriving SWAT team members were deployed around the home. Defendant Pledger and his assistant, Corporal Troy Windsor, then set up a command post in the back of the SWAT team's equipment truck, which was parked outside of Plaintiff's home. From that location, Defendant Pledger and other officers monitored negotiations, discussed tactics, and oversaw on-scene conduct generally.

At 3:24 a.m., just after Defendant Pledger arrived on scene, another officer, identifying himself as a negotiator, opened the cruiser door and spoke to Plaintiff. He asked for additional personal information about Collier. Plaintiff sobbed as she responded. The encounter concluded with these words from the officer: "OK, alright, uh, these officers here might have a couple more questions for you, OK? Just relax and tell 'em what you know, OK?" Then he closed the door.

Less than a minute later, Officer Erick Gonnuscio of the Ogden Police Department opened the door and said, "Hi, I'm Officer Gonnuscio with the Ogden City Police. I just want to ask you a couple of questions. I know you've already talked to a bunch of people and everything." Plaintiff responded with a tearful "OK." Defendant Gonnuscio interviewed Plaintiff regarding Collier, their relationship, and the night's events. They discussed whether Collier might be on some sort of narcotic and what weapons he might have available to him in the home. As they discussed Collier's uncharacteristic behavior, Defendant Gonnuscio asked Plaintiff: "How likely is it that he would end up shooting himself if we went in the house? I know it's kinda hard to talk about, but is that a possibility?" Plaintiff responded that she could not rule it out because Collier was acting so strangely.

After further discussion about Collier's weapons, Defendant Gonnuscio said he might come back to ask more questions. Plaintiff asked Defendant Gonnuscio to try to find her other dog inside the home. Defendant Gonnuscio explained that the officers were not planning to enter the home because Collier was armed and they wanted to avoid a shootout. He said the officers were trying to find a "peaceful resolution here, . . . we're trying to get him to surrender and come out." When Plaintiff again expressed concern about her other dog, Defendant Gonnuscio said, "If I see it, I'll bring it to you, and then we can go from there." Defendant Gonnuscio told Plaintiff to "sit tight" and closed the door.

At 3:50 a.m., SWAT personnel surrounding the home reported that Collier had "peeked out the front door and window, then closed the door again." Approximately four minutes later, Collier was seen at the rear door of the home, and officers yelled to him to surrender. It was not clear to the officers whether Collier still had his handgun. Collier then retreated back out of sight. Defendant Pledger testified that Collier "was seen to be moving through the home, closing doors, turning off lights, peeking through windows, and those kinds of things." Defendant Pledger and other officers suspected that these actions were an attempt to "gain a tactical advantage over" the officers by obscuring Collier's position in the home. Defendant Pledger testified the following regarding the sightings of Collier:

> **Q:** Was there an opportunity to shoot Mr. Collier?
> **A:** Would it have been possible for them to do so? Yes.
> **Q:** Did you consider doing that?
> **A:** Not at those times it was possible to do so.
> **Q:** Why?
> **A:** He clearly wasn't a threat to someone other than himself. Now he might have remained a potential threat to his own life . . . but he was not a threat to any of my people or anyone other than himself at those points.

Defendant Pledger testified that he could not recall any additional instances where his team reported a sighting of Collier until the SWAT shield team entered the home and found Collier's

body. He also could not recall any instance during the standoff where Collier "threaten[ed] anyone" or "yelled out of the home at anyone."

Sometime before 4:00 a.m., Plaintiff's sister, Jaime, approached officers to tell them that Collier had been calling her cellphone. Defendant Pledger learned from Jamie that Collier was "heavily intoxicated." Defendant Pledger connected Jaime with Defendant Weir, the chief negotiator on the scene, to obtain further information regarding Collier's current status and location in the home. Defendant Weir determined that Jamie was an appropriate candidate to act as a third-party intermediary who could facilitate negotiations between the SWAT team and Collier. From 4:00 a.m. onward, Jamie communicated intermittently with Collier under the direct supervision of negotiation staff. While Collier was occasionally willing to speak to Jaime, he would not agree to exit the home or otherwise surrender to officers.

Just after 4:00 a.m., Officer Bryce Weir of the Roy City Police Department opened the cruiser door and spoke to Plaintiff. After introducing himself, he asked, "Are you doing OK?" He continued, "Hell of a night. Alright, these guys are gonna be here with you, OK? If you need something, please let them know. We appreciate your help." Defendant Weir asked if Plaintiff might be able to draw another diagram of her home as needed. He then told her to keep warm in the car and thanked her again for her help. He also said that they planned to "get everybody safe . . . including Aaron [Collier]." Then he shut the door "to keep [Plaintiff] warm."

After several minutes, Defendant Weir returned and asked Plaintiff to draw a more detailed diagram of her home. He also informed Plaintiff that her sister was on-scene and assisting the officers to coax Collier out of the home and "get him any medical attention he needs." Defendant Weir then left to get Plaintiff some tissues, again closing the door. He

returned minutes later with tissues and offered Plaintiff a granola bar. After additional discussion regarding the layout of the home, Defendant Weir left Plaintiff in the patrol car.

At 4:22 a.m., an officer, presumably Defendant Whitehead, entered the cruiser complaining of the cold outside. At about the same time, Defendant Pledger learned that Collier had reported to Jamie that "he was dying" and abruptly ended the phone call. Moments later, the negotiations staff reestablished contact with Collier, who reported to Jamie that he wanted a cigarette and that he had been shot twice—once in the stomach and once in the knee. Collier refused to elaborate on his purported wounds and refused to exit the home when promised both medical care and a cigarette. Further, he refused to tell Jamie or the officers where he was located in the home.

At 4:24 a.m., Detective Rob Carpenter of the Weber County Attorney's Office approached the cruiser and spoke with Plaintiff. Their conversation follows:

> **Defendant Carpenter:** This is Stacee? Hi, I'm Rob Carpenter, how are you? You OK?
> **Plaintiff:** [no response]
> **Defendant Carpenter:** No?
> **Plaintiff:** [sobbing]
> **Defendant Carpenter:** All right, this officer is going to take you down to the police department right now, OK? And, uh, he'll let you call whoever you need to call, OK? And see to it that you get whatever you need to get. And we'll be in touch with you, OK? This officer will probably come down and interview you. Is that all right?
> **Plaintiff:** [inaudible]
> **Defendant Carpenter:** OK.
> **Plaintiff:** I have my dog, but there's another one and I, I don't know if he's OK or if he's wandering around outside. I just want to make sure that he's all right.
> **Defendant Carpenter:** What kind of dogs are they?
> **Plaintiff:** Shih-Tzus [inaudible].
> **Defendant Carpenter:** Just little dogs?
> **Plaintiff:** [inaudible]
> **Defendant Carpenter:** Oh, OK. Well, he's certainly not causing any trouble. All right.

**Officer Kory Checketts (Ogden City Police Department)[3]:** Is he the same color of dog?
**Plaintiff:** No, he's [inaudible].
**Defendant Checketts:** Black?
**Defendant Carpenter:** Blonde?
**Plaintiff:** Blonde, his name is Sugar.
**Defendant Carpenter:** What's his name?
**Plaintiff:** Sugar.
**Defendant Carpenter:** Sugar?
**Defendant Checketts:** Sugar.
**Defendant Carpenter:** OK. All right. He'll be down to talk to you. It's gonna be a long time, I won't kid you. But they'll make you as comfortable as they can.
**Plaintiff:** [inaudible][4]
**Defendant Carpenter:** OK? All right, I'll be down to talk to you.
**Plaintiff:** Did you want . . . here's the . . .
**Defendant Carpenter:** [inaudible conversation with Defendant Weir]
**Defendant Weir:** How's that drawing coming, there? Let me take a look and see what you got.

At this point, Plaintiff continued to describe the layout of her home to Defendant Weir, who told her, "You're doing fantastic, thank you." Plaintiff explained the location of various rooms in the house as well as the location of windows within those rooms. Defendant Weir again asked Plaintiff about Collier's weapon and then left the cruiser.

After several minutes, officers standing outside the cruiser discussed the number of cars in the driveway of Plaintiff's home. Plaintiff volunteered without being asked that there were two cars in the driveway. Defendant Checketts then spoke with Plaintiff regarding the location and ownership of the cars. In the middle of Plaintiff's conversation with Defendant Checketts, Defendant Weir returned one final time to ask Plaintiff about the windows in the upstairs room

---

[3] At this point, it appears that both Defendant Checketts and Defendant Weir had joined the conversation. While the Court cannot definitively confirm from the recording that Defendant Checketts is in fact the officer speaking at this point, his voice is audibly distinguishable from Defendant Weir, who resumes discussion with Plaintiff after Defendant Carpenter leaves the cruiser. As no party appears to dispute either Defendant Checketts' or Defendant Weir's presence at this point in the conversation, the Court assumes that Defendant Checketts was the one asking questions about Plaintiff's dog.

[4] Plaintiff asserts that the recording picks up only an "emotional sound" from Plaintiff at this juncture. ECF No. 206, at 21. While the Court's review of the recording leaves the distinct impression that Plaintiff replied "OK," the question of what was said does not alter the outcome of the analysis undertaken below. Therefore, the Court adopts Plaintiff's version of the response for purposes of this opinion.

of her home. Plaintiff and Defendant Weir then discussed the officers' plan to get Collier to exit the home and "get him medical attention." Plaintiff said that she did not want her home "destroyed." Defendant Weir assured Plaintiff that the officers were not there to "hurt [Collier]" or "to destroy property" and indicated that the onus was on Collier to comply with requests to exit the home and surrender. Defendant Weir indicated that Collier was still extremely intoxicated and "not thinking straight."

After this exchange, Defendant Checketts asked a few more questions about Plaintiff's home, and Plaintiff explained the layout of her backyard. Plaintiff described the situation as a "nightmare" and again expressed her confusion at Collier's behavior, explaining that he had "his life together." Soon, Defendant Weir returned and spoke briefly with Defendant Checketts:

> **Defendant Weir**: Hey Kory.
> **Defendant Checketts**: Yeah?
> **Defendant Weir**: I think we're good for the moment, so whatever you guys gotta do. I'll call you if we have any questions.
> **Defendant Weir**: [to Plaintiff] Thank you so much, I appreciate your help, OK? This is a good guy, he'll take good care of you, OK? If you have questions, let him know. Appreciate all your help. You can hold onto that box of Kleenex if you need to, OK? Thank you. And I got information on the dog as well—I'll let them know to keep an eye on the dog, OK?
> **Plaintiff**: OK.
> **Defendant Weir:** We'll get that squared away.

(*Id.* at 4:41:00–4:41:50). Defendant Weir and Defendant Checketts then left Plaintiff alone in the cruiser with her dog and Defendant Whitehead. After a few minutes of silence, Plaintiff spoke to Defendant Whitehead:

> **Plaintiff**: Hey, do you know why I need to go, just, they wanna talk to me or why? Why?
> **Defendant Whitehead:** Just because of the incident. They want to talk to you, debrief from you [sic].
> **Plaintiff:** Am I in trouble or something?
> **Defendant Whitehead:** No, no.
> **Plaintiff:** I just wanna know why they handcuffed me.

**Defendant Whitehead:** Well, that's because we get here and we don't have any idea what's going on, we don't know who's who. Something this serious, everybody gets handcuffed 'till we can figure it out.

At 4:50 a.m., Defendant Pledger learned that Collier had called another friend and told him he "just wanted to end it." Defendant Weir, acting as chief negotiator, concluded that Collier "was not making any apparent efforts toward any particular outcome" and was becoming "less willing to speak with negotiators, to the point of hanging up on both negotiators and [Jamie] and then refusing to answer the phone."[5] Defendant Weir told Defendant Pledger and other officers at the command post that Collier's cooperation with negotiators was deteriorating, that he was still highly intoxicated, and that he "was not responding to positive negotiation efforts." Furthermore, because Collier had been seen at various points in the home, Defendant Pledger was concerned that the report of injuries was an attempt "to lure officers back inside under the ruse that he was injure[d] and dying so that he could ambush them outright again, or force officers into killing him."

At 4:51 a.m., an officer walked up to Defendant Whitehead's cruiser and instructed him to drop Plaintiff off in the back parking lot of the police station where another officer would be waiting. As Defendant Whitehead pulled away from the curb, Plaintiff asked if he knew "by chance, how [her sister] came to be here?" Defendant Whitehead responded that he had "no idea." Plaintiff then said, "OK, I just wondered, because she had left." Plaintiff and Defendant Whitehead then departed the scene and drove to the police station.

---

[5] At this point, Collier began hanging up on Jamie and then not answering when she called back. Evidently, Collier had been on the phone with a friend, but Collier again stopped responding to Jamie and negotiators just after 4:51 a.m. After being alerted of the planned introduction of gas into the home, Defendant Weir reported to other negotiators that the "[s]urrender plan if needed is out front door, hands up, follow instructions." Directly before the gas was deployed and sometime after 5:00 a.m., Collier was back in touch with Jamie and demanded three cigarettes. As described above, the last communication between Collier and Jamie was directly after the introduction of gas into the home when he said, "I'm sorry. Goodbye."

At 5:00 a.m., Plaintiff and Defendant Whitehead arrived at the police station, where another officer was waiting to meet them. Defendant Whitehead exited the vehicle and circled to the rear passenger door, where he opened the door and said, "All right, grab all your stuff. [Let's] get you inside and get you warm." Plaintiff then exited the vehicle with her dog in her arms and followed the other officer into the station. Approximately forty-five minutes passed before Plaintiff actually entered the interview room. There is little evidence of what occurred during that time period, but Plaintiff testified that she was led through hallways at the station until she encountered either Lansky or Martinez. Subsequently, one of these men offered to hold Plaintiff's dog while she was being interviewed. At 5:46 a.m., Plaintiff entered the interview room with Defendant Goff. Plaintiff testified that she entered the interview room "voluntarily" to answer questions in hopes of resolving the situation. Defendant Goff gathered basic information from Plaintiff about her name, phone number, and occupation, and then had the following exchange:

> **Defendant Goff:** You understand—I just want you to understand that you're here voluntarily to explain to me what happened tonight. It's gonna be a voluntary statement. There's no duress here, I'm not making you do anything. Everything you say is gonna be true and accurate to the best of your knowledge—you're not gonna lie about what happened. Uh, the information you give may be used in a preliminary hearing that a judge could hear. Um, and I just want you to understand that it's voluntary and—you're good with that?
> **Plaintiff:** OK.
> **Defendant Goff:** You understand?
> **Plaintiff:** Uh-huh.

Plaintiff then explained the whole night from the beginning of the evening until the time she arrived at the station. Defendant Goff asked clarifying questions. He asked Plaintiff about the possibility that Collier had used drugs (which might explain his uncharacteristic behavior), his drinking habits, and other issues related to his violent behavior that night. The entire interview lasted just under an hour. After the interview concluded, Defendant Goff exited the room to

retrieve a glass of water for Plaintiff. He returned a few minutes later and then exited the room again.

Back at Plaintiff's home, Defendant Pledger believed negotiations were deteriorating. He was also concerned about the weather conditions that night. He testified:

> The temperature outside has a debilitating effect on my personnel, on the law enforcement personnel that are outside. In other words, it isn't just that they're cold and they're uncomfortable. There becomes [sic] a physiological effect on their bodies so that if we should have to go to some other form of force other than these things we're attempting to do to bring it about peacefully now their fingers no longer work as well, their grip isn't the same. The effects of what goes on with their mind is different because of those extreme cold temperatures that they were in that night. . . .
>
> Again, my people are being affected by an environment that [Collier] is not. The longer that that continues the more detrimental effect it has on my people. As I've already stated, there's no other people that can come in and replace them. So the longer this goes, the worse it becomes for my people and the better it becomes for him. Again, he's trying to gain a tactical advantage over my people by shutting off the lights, by peeking through the windows, by doing those kinds of things. [6]

At 5:03 a.m., Defendant Pledger instructed Officer Colten Johansen of the Ogden Police Department to fire 40mm CS gas canisters through the windows in the basement of Plaintiff's

---

[6] Plaintiff appears to argue that the unusually cold weather that night was not a factor in the decision to use CS gas and otherwise enter her home without a warrant because it was not mentioned in any officer's report. The Court doubts that any police report on situations and decision-making this complex ever addresses every factor that crossed the mind of the officer who wrote it. Moreover, the testimony of Defendant Jackman, cited by Plaintiff to demonstrate "that the cold did not present a serious problem for officers," plainly suggests the opposite. Defendant Jackman testified that he was cold, and that he had, as a unit paramedic, advised commanding officers that other officers were likely to be affected by the cold temperatures and would need to take mitigating measures in order to stave off ill-effects arising therefrom. More to the point, the Court's determination of the existence of an exigency requires an objective evaluation of the circumstances officers faced that night. *See United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) ("We review the question of whether exigent circumstances justified a warrantless entry into a home . . . [by] evaluating the circumstances as they would have appeared to prudent, cautious, and trained officers at the time."). The substance of Defendant Pledger's commentary on the effects of cold weather on SWAT members flows naturally from the indisputable fact that this incident occurred at 3:00 a.m. on a frigid November night. Even for purposes of the qualified immunity inquiry, the Court is not required to accept as true Plaintiff's unsupported and untenable assertion that the cold did not affect the officers. *See A.M.*, 830 F.3d at 1136 (explaining that courts need not "accept the plaintiff's version of the facts" in a summary judgment qualified immunity analysis if that version of the facts is not supported by the record). Thus, the fact of the cold weather, as well as the results that would naturally flow therefrom, inform the Court's understanding of what circumstances "prudent, cautious, and trained officers" would have encountered "at the time" of the incident. *See Thomas*, 372 F.3d at 1177; *United States v. Porter*, 594 F.3d 1251, 1256 (10th Cir. 2010) ("The test is whether the circumstances, viewed objectively, justify the action; 'the officers subjective motivation is irrelevant.'" (brackets omitted)).

home. Defendant Johansen fired several rounds into the basement, one through each window. As the tactical operation began, Defendant Weir continued efforts to communicate with Collier in the home by calling his phone. Officers at the command center learned that, shortly after gas canisters were fired through the windows, Collier told Jamie, "I'm sorry. Goodbye." At approximately 5:05 a.m., Defendant Pledger learned that someone on-scene heard a single "pop" that may have been a gunshot inside the home.

After introduction of the gas, Defendant Pledger and his fellow officers received no communications from Collier and were not able to get him to answer his phone. Defendant Pledger theorized that Collier could "be behind a closed door in one portion of the house and be completely unaffected by even a heavy concentration of [the gas] in another room." Consequently, at 5:09 a.m., Defendant Pledger ordered Defendant Johansen to introduce more gas into the home through windows on the main level. With no response from inside the home, SWAT officers continued to fire CS gas rounds through the windows on the front of the home. Defendant Pledger and the other officers knew of a door leading from the home into the attached garage, and thinking Collier might be hiding from the gas in the garage, Defendant Pledger ordered more rounds be placed through the garage windows at 5:17 a.m.

At 5:42 a.m., officers near the garage reported "hearing a noise" inside. Believing Collier to be hunkered down in the garage, Defendant Pledger ordered one final round fired into the garage. Defendant Pledger then ordered Officer Armando Perez of the Roy City Police Department to "clear as much of the garage as possible" by using a mirror and observing through the garage window. Defendant Perez reported that "he could not see much" because of the clutter in the garage.

At this point, Defendant Pledger ordered a "noise/flash diversion device" deployed through the garage window. After deploying the device, officers entered the garage, but Collier was not inside. At 6:16 a.m., after considering and deciding against the deployment of a K-9 unit to search for Collier in the home, Defendant Pledger ordered Defendant Perez and a SWAT "shield team" to breach the front door with a battering ram. The SWAT shield team entered through the front door and began a sweep of the home in search of Collier. They found his body at 6:27 a.m., with a semi-automatic pistol loaded with an extended magazine.[7] Defendant Jackman and another officer declared him "obviously deceased . . . due to a self-inflicted gunshot wound to the head." The SWAT shield team cleared the remainder of the home and exited the premises. It is undisputed that no warrant was in place authorizing any entry into Plaintiff's home.

By this point, Plaintiff had been sitting alone in an interview room at the police station for nearly an hour. At 6:45 a.m., Defendant Goff returned to the interview room and informed Plaintiff that Collier was dead. Defendant Goff then asked if Plaintiff would like Lansky to be with her in the interview room. Plaintiff responded "I don't know" and began to cry. Defendant Goff brought Lansky into the room, and soon thereafter, Plaintiff asked to call her mother. Defendant Goff led her to a phone, and she called her mother. She told her mother that Collier was dead and asked for a ride home from the police station. Then she waited in an office area with cubicles until her mother arrived and drove her home.

## II.        SECTION 1983 CLAIMS AGAINST DANIEL FUHR AND THE STATE OF UTAH

Plaintiff's First, Second, Third, and Eighteenth Causes of Action allege § 1983 violations by the State of Utah or Defendant Daniel Fuhr in his official capacity as Superintendent of the

---

[7] The subsequent autopsy also revealed twenty rounds of ammunition stashed in Collier's clothing.

Utah Highway Patrol. "But a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted). The Supreme Court and the Tenth Circuit have made clear that "neither the state, nor a governmental entity that is an arm of the state for Eleventh Amendment purposes . . . is a person within the meaning of §1983." *Harris v. Champion*, 51 F.3d 901, 905-06 (10th Cir. 1995); *Will v. Michigan*, 491 U.S. at 71 (holding that "neither a State nor its officials acting in their official capacities are 'persons' under §1983."). Therefore, the relevant claims underlying those causes of action are dismissed with prejudice for failure to state a claim.[8]

## III.     MOTIONS TO DISMISS

### A.  SECTION 1983 PROCEDURAL DUE PROCESS CLAIMS

Weber Defendants argue that this Court lacks subject-matter jurisdiction over the takings claims in Plaintiff's First and Sixth Causes of Action. Weber Defendants maintain that Plaintiff has adequate post-deprivation remedies under Utah State law and therefore those claims are not ripe for consideration. Whether the claims are ripe for review bears on this Court's subject-matter jurisdiction under Article III of the United States Constitution. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir. 1995).

"[O]verlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." *Zinermon v. Burch*, 494 U.S. 113, 124 (1990). This general rule applies to two of the three kinds of § 1983 claims. *Id.* at 125. First, the rule applies to claims

---

[8] Ordinarily, the Court is reluctant to dismiss claims under Rule 12(b)(6) *sua sponte*. However, the Tenth Circuit has held that "a district court may dismiss a claim *sua sponte* 'when it is patently obvious' that the plaintiff could not prevail on the facts alleged.'" *Raine v. Nessmith*, 67 F.3d 312 (1995) (Table Opinion) (quoting *McKinney v. Okla. Dept. of Human Servs.*, 925 F.2d 363, 365 (10th Cir. 1991)). The Court dismisses here with prejudice because there no set of facts would permit Plaintiff to plead these claims against the State of Utah or Defendant Fuhr in his official capacity.

premised upon specific protections defined in the Bill of Rights and incorporated by the Due Process Clause of the Fourteenth Amendment. *Id.* Second, the rule applies to claims premised upon violations of substantive due process. *Id.* However, "the existence of state remedies *is* relevant" to claims based upon violations of procedural due process. *Id.; see also Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 372 (1986). Consequently, Plaintiff's procedural due process claims are not ripe to the extent that there are adequate post-deprivation remedies under Utah law, and Plaintiff admits as much. *See* ECF No. 274 at 5.

Plaintiff's First Cause of Action includes a claim under § 1983 for deprivations of three procedural due process rights: the right not to be deprived of liberty without due process of law, the right not to be deprived of property without due process of law, and the right to just compensation for taking of property for public use. Similarly, Plaintiff's Sixth Cause of Action alleges, in part, violations of procedural due process. Specifically, Plaintiff alleges, "In seizing Plaintiff and/or in seizing and damaging and destroying her property and in causing Collier to commit suicide in Plaintiff's home, Defendants at the scene . . . without due process of law, intentionally deprived Plaintiff of her civil rights . . . in violation of the Fifth and Fourteenth Amendments, substantively and procedurally." She continues, "In unlawfully seizing Plaintiff and damaging her property, Defendants at the scene deprived Plaintiff of procedural due process." ECF No. 160 at 38-39.

In procedural due process claims such as these, deprivation of life, liberty, or property is not itself unconstitutional. *Zinermon*, 494 U.S. at 125. "[W]hat is unconstitutional is the deprivation of such an interest *without due process of law*." *Id.* (citing *Parratt*, 451 U.S. at 537; *Cary v. Piphus*, 437 U.S. 247, 259 (1978)). Consequently, "to determine whether a constitutional

violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.* at 126. Usually, "the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property." *Id.* at 127 (listing cases). However, postdeprivation hearings or common-law tort remedies may satisfy due process when "either the necessity of quick action by the State or the impracticality of providing any predeprivation process" is "coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking." *Parratt*, 451 U.S. at 539.

In this case, the necessity of quick action by law enforcement officials is obvious. Collier, extremely intoxicated and acting irrationally, fired several shots at officers responding to Plaintiff's 911 call. He barricaded himself inside Plaintiff's house, moved from room to room, turned off the lights, and refused to surrender to law enforcement. In these circumstances, and particularly at 4:00 a.m., "[i]t is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Hudson v. Palmer*, 468 U.S. 517, 532 (1984). The best that can be done when quick action is essential is to allow injured individuals to recover damages after the fact.

Plaintiff's Complaint includes a litany of claims arising under state law, including claims for false imprisonment, assault, battery, trespass to real property and chattels, conversion, damaging property for public use in violation of Article I, Section 22 of the Utah Constitution, and damaging or destroying property without due process in violation of Article I, Section 7 of the Utah Constitution. ECF Nos. 160 at 40-41, 41, 41-42, 44, 45, 45-46, 46-47. The Court finds that Plaintiff has at least these adequate post-deprivation remedies available. Consequently, Plaintiff's procedural due process claims under § 1983 are not ripe and must be dismissed without prejudice for lack of subject-matter jurisdiction.

## B.   FIFTH AMENDMENT TAKINGS CLAIM

Weber Defendants also argue that Plaintiff's Fifth Amendment Takings Claim in her Fifteenth Cause of Action is not ripe. In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985), the Supreme Court explained that "because the Fifth Amendment proscribes takings *without just compensation*, no constitutional violation occurs until just compensation has been denied. The nature of the constitutional right therefore requires that a property owner utilize procedures for obtaining compensation before bringing a § 1983 action." *Id.* at 194 n.13. The Court also set out two requirements that must be met for a Fifth Amendment takings claim to be ripe. First, "the government entity charged with implementing the regulations [must have] reached a final decision regarding the application of the regulations to the property at issue." *Id.* at 186. Second, the plaintiff must have sought "compensation through the procedures provided by the State for doing so." *Id.* at 194. A plaintiff's "failure to seek review of the City's action under the procedures authorized by state law renders his takings claim unripe." *Bateman v. City of West Bountiful*, 89 F.3d 704, 706 (10th Cir. 1996).

Plaintiff admits that she must show lack of an adequate state law remedy. *See* ECF Nos. 227 at 6, 274 at 6. Plaintiff has not sought compensation through state procedures, nor has she alleged that state law remedies are inadequate. Consequently, her takings claim is unripe and must be also dismissed without prejudice for lack of subject-matter jurisdiction.

## IV.   SUMMARY JUDGMENT STANDARD

### A.   RULE 56

All parties have moved for summary judgment in some form. Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." In applying this standard, courts must "construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). However, the nonmoving party "is entitled to only those inferences that are 'reasonable.'" *Hornady Mfg. Co. v. Doubletap, Inc.*, 746 F.3d 995, 1004 (10th Cir. 2014) (quoting *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013)). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Tabor v. Hilti, Inc.*, 73 F.3d 1206, 1215 (10th Cir. 2013) (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)).

"[T]he movant bears the burden of showing the absence of a genuine issue of material fact, [but] the movant need not negate the nonmovant's claim." *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996). "[A] movant may make its prima facie demonstration by pointing out to the court a lack of evidence on an essential element of the nonmovant's claim." *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007). Once the movant meets this initial burden, the "nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Jenkins*, 81 F.3d at 990. "[C]onclusory allegations without specific supporting facts have no probative value," and a conclusory affidavit is "insufficient to support summary judgment." *Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134, 1143–45. (10th Cir. 2005) (internal quotation marks omitted). Ultimately, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B. TREATMENT OF CROSS MOTIONS

"Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). "When the parties file cross motions for summary judgment, [the court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted). At the same time, Rule 56 permits courts to consider materials in the record other than those cited by the parties. *See* FED. R. CIV. P. 56(c)(3).

### C. QUALIFIED IMMUNITY AT SUMMARY JUDGMENT

In a § 1983 action, "[i]ndividual defendants . . . may raise a defense of qualified immunity, 'which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law.'" *Henderson v. Glanz*, 813 F.3d 938, 951 (10th Cir. 2015) (quoting *Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008)). Because qualified immunity "is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial, . . . a plaintiff's burden in opposing a motion based on qualified immunity is greater than for other summary judgment motions." *Snider v. Lincoln Cty. Bd. of Cty. Comm'rs*, 313 F. App'x 85, 91 (10th Cir. 2008). Specifically, "[w]hen a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly

established."[9] *Courtney v. Okla. ex rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). In evaluating whether a plaintiff has met this burden, the Court must "view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inference in its favor." *Henderson*, 813 F.3d at 952; *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (asking whether "a violation could be made out on a favorable view of the parties' submissions"). This Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Courtney*, 722 F.3d at 1222. Although the Court views the facts in the light most favorable to Plaintiff when analyzing qualified immunity, her allegations must find support in the record at summary judgment. *See A.M. v. Holmes*, 830 F.3d 1123, 1136 (10th Cir. 2016) (explaining that, although "courts ordinarily accept the plaintiff's version of the facts" in a qualified immunity analysis, at summary judgment, the "plaintiff's version of the facts must find support in the record").

Additionally, although courts typically adopt the plaintiff's version of the facts on a qualified immunity analysis, where unchallenged video evidence or other evidence in the record contradicts plaintiff's version of events, "a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

---

[9] Plaintiff repeatedly asserts that Defendants, as government agents, have the burden of demonstrating that her consent was voluntary. *See, e.g.*, ECF No. 283, at 95. Plaintiff misunderstands the burden-shifting that occurs when a public official defendant asserts qualified immunity. In reality, Defendants bear "the traditional summary judgment burden" of demonstrating that Plaintiff's consent was voluntary "if and only if, . . . [P]laintiff meets the two-part test." *Snider*, 313 F. App'x at 91. That strict test requires Plaintiff to demonstrate both that her rights were violated and that her rights were clearly established. Defendants are not obligated to prove her consent was voluntary until Plaintiff has met the test. *See id.*

# V.  FALSE ARREST CLAIMS UNDER § 1983

Plaintiff has moved for summary judgment on her claims for false arrest under § 1983 against Defendants Reaves, Sube, Cragun, Tarwater, Young, Gonnuscio, Goff, Checketts, Whitehead, Pledger, Windsor, Weir, and Carpenter, as well as municipal defendants Ashment, Thompson, Smith, Ogden City, and Weber County. Each defendant has filed a cross-motion for summary judgment on the same claims, and each individual defendant has raised the defense of qualified immunity. As explained below, the Court concludes that all individual defendants are entitled to qualified immunity and summary judgment on these claims. Additionally, all municipal defendants are entitled to summary judgment on these claims.

## A.  DEFENDANTS CARPENTER, WEIR, AND CHECKETTS[10]

Plaintiff asserts that Defendants Carpenter, Weir, and Checketts were present when Plaintiff was told that she would be transported to the police station and asked whether that would be "all right." Each of these defendants has also raised the qualified immunity defense. Thus, there are two questions before the Court regarding these defendants: First, whether their actions violated Plaintiff's constitutional right to be free from an unreasonable seizure and, second, whether the law was clearly established such that these defendants would know that their conduct violated Plaintiff's constitutional rights. Without deciding whether the transportation of Plaintiff from the scene or the additional questioning at the police station violated Plaintiff's Fourth Amendment rights, the Court exercises its "discretion to proceed straight to the latter

---

[10] The following analysis may also apply to Defendant Whitehead, as it is not clear from the record whether he was present when Defendant Carpenter asked Plaintiff if it would be "all right" if she was transported to the station and questioned. An officer seated in the cruiser, presumably Defendant Whitehead, can be heard speaking both before and after the conversation between Defendant Carpenter and Plaintiff. If Defendant Whitehead was not present, the analysis regarding his knowledge, *infra* at 35-42, is applicable and shields him from liability. If he was present, the qualified immunity analysis that follows would be equally applicable to him. In either event, Defendant Whitehead is entitled to qualified immunity from Plaintiff's claims of false arrest under § 1983.

question and resolve this claim on the clearly-established-law prong of [the] qualified-immunity test." *Quinn v. Young*, 780 F.3d 998, 1007 (10th Cir. 2015).

### 1. Clearly Established Law

"A [g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal quotation marks omitted); *see also Henderson*, 813 F.3d at 951. In evaluating whether a right is "clearly established," the Supreme Court has warned courts "not to define clearly established law at a high level of generality." *Ashcroft*, 563 U.S. at 742. "Regarding the requisite proof of clearly established law, 'a plaintiff may satisfy this standard by identifying an on-point Supreme Court or published Tenth Circuit decision; alternatively, the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) (quoting *Quinn v. Young*, 780 F.3d 998, 1005 (10th Cir. 2015)). While the Tenth Circuit typically requires a "Supreme Court or published Tenth Circuit decision on point" to confirm that a right is clearly established, *see Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013), Plaintiff need not come forward with "a case *directly* on point, but existing precedent must have placed the statutory or constitutional question beyond debate," *al-Kidd*, 563 U.S. at 741; *accord Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) ("The plaintiff is not required to show . . . that the very act in question previously was held unlawful . . . to establish an absence of qualified immunity."); *Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007) ("While the facts of the cases compared need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability.").

The determination of whether the relevant facts present a violation of clearly established law is a pure question of law. *See Cox*, 800 F.3d at 1246 n.7; *Mick v. Brewer*, 76 F.3d 1127, 1135 (10th Cir. 1996). In the Fourth Amendment context, that question of law ultimately turns on "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 224 (internal quotation marks omitted).

The Tenth Circuit has "adopted a sliding scale to determine when law is clearly established. The more obviously egregious the conduct in light of the prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *A.M. ex rel. F.M. v. Holmes*, 830 F.3d 1123, 1135–36 (10th Cir. 2016) (internal quotation marks omitted). At the same time, the Tenth Circuit has stressed that a plaintiff "must shoulder a quite heavy burden in showing that the law was clearly established." *Id.* at 1147; *see also Felders v. Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) ("[T]he record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." (internal quotation marks omitted)). "[A]n officer might lose qualified immunity even if there is no reported case directly on point[,] . . . [b]ut in the light of pre-existing law, the unlawfulness of the officer's conduct must be *apparent*." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (emphasis added) (internal quotation marks omitted). In other words,

> to demonstrate that qualified immunity is not appropriate, a plaintiff may not simply allege—and the district court likewise may not accept as sufficient—the defendant's violation of an amorphously-defined Fourth Amendment right. We have required the showing of a *substantial correspondence* between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.

*Quinn*, 780 F.3d at 1009–1010 (internal quotation marks omitted).

A plaintiff opposing the application of qualified immunity cannot shoulder her "heavy burden" by merely "relying upon authorities that do no more than establish general legal principles—even if those principles are apposite in the [Fourth] Amendment . . . context." *Cox*, 800 F.3d at 1247 n.8; *accord Snider*, 313 F. App'x at 92 (explaining that plaintiffs' "citation to authorities holding that warrantless searches and seizures are presumptively unreasonable[] do[es] not come close to satisfying their burden"). While a reasonable officer is presumed to have a working knowledge of the prevailing law, he or she is not presumed to be able to extrapolate from ambiguous or otherwise unsettled law. *See Ziglar*, 137 S. Ct. at 1867; *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[T]he salient question . . . is whether the state of law in 1995 gave [the officers] fair warning that their alleged treatment of [plaintiff] was unconstitutional."). Ultimately, a reasonable officer must be able to determine that the alleged conduct "was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "[I]f a reasonable officer might not have known for certain that the conduct was unlawful . . . then the officer is immune from liability." *Ziglar*, 137 S. Ct. at 1867. Thus, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* Whether "the contours of [a particular constitutional] right . . . are sufficiently clear that a reasonable official would understand that what he is doing violates that right" is ultimately "an objective legal question." *Manzanares*, 575 F.3d at 1146 (internal quotation marks omitted).

## 2. Voluntary Consent

Plaintiff was neither under arrest nor suspected of any crime, yet she was technically detained for purposes of safety and maintenance of the status quo during an ongoing standoff. There is no indication from the record that Plaintiff would have been free to exit Defendant Whitehead's cruiser and wander around the scene while officers ringed the home with weapons and Collier remained barricaded in the home. At the same time, there is no indication that

officers at the scene intended to arrest Plaintiff or to detain her beyond the time necessary to resolve the standoff. In this context, Plaintiff was approached by Defendant Carpenter, who explained that the officers intended to transport her to the police station and to question her there regarding the night's events. Defendant Carpenter then asked Plaintiff, "Is that all right?" The uncontroverted evidence therefore shows that Plaintiff, while lawfully detained, was explicitly asked to consent to her transportation to the police station for further questioning. Thus, the Court must focus its analysis of clearly established law on the doctrine of voluntary consent.

"Voluntary consent is an exception to the [presumptive] unreasonableness of a warrantless search or seizure." *United States v. Evans*, 994 F. Supp. 1340, 1342 (D. Kan. 1998). The Court finds the Tenth Circuit's two-step framework for evaluation of voluntariness of consensual police searches most analogous to the situation at hand.[11] The proponent of voluntary consent must (1) "proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given"; and (2) demonstrate that "the officers . . . used no implied or express duress or coercion." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010); *see also Untied States v. Jones*, 701 F.3d 1300, 1317 (10th Cir. 2012) (providing slightly different language for consent to search a home: "Voluntary consent consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given." (internal quotation marks omitted)). In the context of police-citizen encounters, voluntariness is evaluated "under the totality of the circumstances." *Sanchez*, 608 F.3d at 690.

---

[11] Because the analyses are similarly focused on whether a police intrusion was voluntarily consented to, the Court also cites to cases dealing with the framework for determining voluntary consent to additional questioning after the conclusion of a traffic stop. *See United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003).

a. *Express or Implied Consent*

The first element of voluntary consent is "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." *Id.* Plaintiff's burden at this stage is to demonstrate that the law, as it stood in November 2012, was clearly established such that an officer could not have reasonably concluded that Plaintiff gave legally sufficient consent to transportation and additional questioning at the police station.

The parties disagree on whether Plaintiff verbally assented to transportation and additional questioning. Weber Defendants, for example, insist that Plaintiff can be heard to say "yes" in response to Defendant Carpenter's request in the dash-cam audio. ECF No. 244, at 3. Plaintiff urges that her response to Defendant Carpenter's questioning is unintelligible. ECF No. 248, at 3. While the Court agrees that Plaintiff's response is unintelligible, what Plaintiff actually said in response to Defendant Carpenter's request does not resolve the consent inquiry because voluntary consent does not need to be verbal.

Here, Defendant Carpenter approached Plaintiff and explained specific actions that police desired to take—transporting Plaintiff from the scene and questioning her at the police station—and directly asked Plaintiff if she was "all right" with those actions. It is undisputed she did not object or otherwise indicate that she did not consent to transportation and further questioning at the station from the time Defendant Carpenter made the request to the time she was transported and questioned. In fact, Plaintiff immediately began making provisions for her animals in anticipation of leaving the scene. Directly following her conversation with Defendant Carpenter, Plaintiff spoke calmly with Defendant Weir regarding the floorplan of her home and continued to assist officers on the scene with their inquiries regarding Collier. During that conversation, she raised no objections to her planned transportation or further questioning. The question before the

Court is therefore whether clearly established law produced by Plaintiff precluded a reasonable officer from understanding this conduct as legally sufficient consent under these circumstances.

Plaintiff has presented the Court with no case law suggesting that her failure to object in the face of a direct request for consent, coupled with her continued cooperative behavior and efforts to make provisions in her absence from the scene, was legally insufficient to convey to a reasonable police officer that she had consented to transportation and further questioning at the police station. In fact, a cursory review of the case law on implied consent in the Fourth Amendment context reveals that the Tenth Circuit has repeatedly held that "consent must be clear, but it need not be verbal. Consent may instead be granted through gestures *or other indications of acquiescence*, so long as they are sufficiently comprehensible to a reasonable officer." *Gurrero*, 472 F.3d at 789–90 (emphasis added); *see also Ringold*, 335 F.3d at 1175 (holding that an affirmative nod of the head was sufficient to grant consent to a search by police). Thus, "'[t]he focus is not whether one subjectively consented, but rather, whether a reasonable officer would believe consent was given' as 'inferred from words, gestures, or other conduct.'" *United States v. Lopez-Carillo*, 536 F. App'x 762, 768 (10th Cir. 2013) (unpublished) (brackets omitted) (quoting *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)); *United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004) ("Whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual.").

Indeed, in a Fourth Amendment home-entry case decided shortly after the events at issue, the Tenth Circuit described the inquiry regarding nonverbal, implied consent as follows: "[I]f Mr. Jones said or did something that permitted the . . . officers to form a reasonable belief that [he] was authorizing them to follow him into his residence, then Mr. Jones may be deemed to

have impliedly consented to their entry of his home." *United States v. Jones*, 701 F.3d 1300, 1321 (10th Cir. 2012). The *Jones* court quoted the previously cited language regarding "other indications of acquiescence" and held that Mr. Jones had impliedly consented to the officers' entry into his home because his affirmative acts—"such as unlocking his backdoor and, once inside, turning toward the officers to make a gesture with his hands as if to state 'see, I got no [marijuana] plants. I got nothing'"—were "not actions that a reasonable officer would have interpreted as signaling Mr. Jones's refusal of the officers' entry into his residence." *Id.*; *see also United States v. Coulter*, 461 F. App'x 763, 767 (10th Cir. 2012) (unpublished) (holding consent to enter a home valid where officer indicated that he did not want individual to enter the residence without him and she "simply looked at him and continued to the house" and "did not object as he stepped through the doorway"); *United States v. Malady*, 209 F. App'x 848, 852 (10th Cir. 2006) (unpublished) (finding consent to follow individual upstairs into the individual's room was reasonably implied where the individual "at no point . . . t[old] the officer to stay downstairs or otherwise indicate that the officer was not welcome to follow him"); *United States v. Siwek*, 453 F.3d 1079, 1084 (8th Cir. 2006) (holding that district court properly found consent to search was voluntary where, among other things, the subject of the search "did not object or withdraw his consent to the search at any time").

While many cases holding nonverbal consent to be adequate for Fourth Amendment purposes have dealt with affirmative physical gestures, an officer presented with the case law described above could reasonably conclude that Plaintiff's failure to object, her continued cooperation with requests for information, and other actions indicating acquiescence fell within the ambit of the "other indications of acquiescence" mentioned in *Gurrero*. In other words, Plaintiff's actions were "not actions that a reasonable officer would have interpreted as signaling

[her] refusal of the officers'" request to transport her to the station for further questioning. *Jones*, 701 F.3d at 1321. Regardless of whether such conduct in fact constituted legally sufficient consent, Plaintiff has not presented any case law suggesting that her conduct would not be "sufficiently comprehensible to a reasonable officer" as a nonverbal display of legally sufficient consent. *See Gurrero*, 472 F.3d at 789–90.

b. *Freely and Voluntarily Given*

The next element of voluntary consent requires that any consent be obtained freely and voluntarily, without "implied or express duress or coercion." *Sanchez*, 608 F.3d at 690. Plaintiff insists that, from an objective standpoint, any consent she gave was not voluntary but rather a "submission to [a] claim of lawful authority" by Defendants. ECF No. 248, at 3. As Plaintiff contends, voluntary consent cannot be established by a "showing [of] a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). Instead, the relevant inquiry is whether "a reasonable person would believe [s]he was free to . . . deny the officer's request." *Gurrero*, 472 F.3d at 790. "Whether consent was coerced, or was instead voluntary, is a fact-bound, totality-of-the-circumstances inquiry." *Bertrand v. Kopcow*, 212 F. Supp. 3d 974, 981 (D. Colo. 2016) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 248–49 (1973)). Accordingly, the Tenth Circuit has provided a list of potentially relevant factors to be considered in evaluating whether consent was coerced. Those factors include:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plane or bus tickets; a request to accompany the officer to the station; interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public.

*Sanchez*, 89 F.3d at 718. "Of course, no one factor is dispositive and the Court must assess the aggregate effect of the situation" on a reasonable individual. *United States v. Viarrial*, 157 F. Supp. 3d 1081, 1086 (D.N.M. 2015).

Attempting to establish that the law regarding consent was so clearly established that no officer could have reasonably concluded that her consent was voluntarily given, Plaintiff cites to a plethora of Supreme Court and Tenth Circuit cases. *See, e.g.*, ECF No. 283, at 94–95. The import of these cases can be summarized by the axiom stated by the Court in *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968): "Where there is coercion, there can be no consent." The mere repetition of this axiom in the case law does nothing to establish that the particular circumstances of the case at bar were so coercive as to foreclose any truly voluntary consent or otherwise put the "constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. In other words, the law cited by Plaintiff "merely instructs [the Court] regarding general principles of the Fourth Amendment," but does "not render obvious that the conduct of the officer[s] in this case violated the Amendment." *A.M.*, 830 F.3d at 1153. Plaintiff has not demonstrated any "substantial correspondence" between the conduct analyzed in the cases cited and the conduct at issue such that a reasonable officer could conclude that Defendants' actions were clearly prohibited. To find that the cases Plaintiff cites were enough to establish clearly the law of voluntary consent under the circumstances of this case would be to "define clearly established law at a high level of generality"—which the Court is simply not permitted to do. *See Mullenix*, 136 S. Ct. at 308. Indeed, "[t]he Fourth Amendment in particular demands . . . specificity [in identifying clearly established law] because law-enforcement officers can have difficulty determining how the relevant legal doctrine will apply to the factual situation the officer confronts." *Harte v. Bd. of Comm'rs of Cty. of Johnson*, 864 F.3d 1154, 1179–1180 (10th Cir.

2017) (Opinion of Lucero, J.). Such specificity is surely necessary where a fact-intensive, totality-of-the-circumstances inquiry like voluntary consent is at issue. *See id.*

Plaintiff has, without much attention to applicable Tenth Circuit or Supreme Court precedent, pointed to several factors—including the fact that no officer ever told her that she was free to refuse consent, that she was technically detained at the time her consent was requested, and that she was obviously distressed when her consent was requested—that could marshal against a finding of voluntary consent. But the mere presence of these factors is insufficient for the Court to conclude that Plaintiff's consent was clearly coerced under established law. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 234 (1973) (explaining that "knowledge of a right to refuse is not a prerequisite of a voluntary consent"); *United States v. Concepcion-Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) ("None of these factors is dispositive . . . as a court must consider all the circumstances surrounding the encounter to determine whether consent was voluntary."); *United States v. Soto*, 988 F.2d 1548, 1557 (10th Cir. 1996) ("Valid consent may be given by a person being detained."). More importantly, the few factors noted by Plaintiff are not nearly enough to demonstrate that a reasonable officer could *only* conclude that Plaintiff's consent was legally insufficient to permit transportation and additional questioning at the police station.

On the contrary, several other undisputed factors indicate voluntary consent or undercut the coercive effect of otherwise potentially oppressive conditions. For example, Defendant Carpenter and other officers addressed Plaintiff in an entirely "pleasant manner and . . . [with a] tone of voice that [was] not insisting." *Ledesma*, 447 F.3d at 1314 (listing factors that evince a consensual encounter); *see also Ringold*, 335 F.3d at 1174 (finding that consent was voluntary where, in part, "the officers remained polite throughout the encounter, and [the individual]

himself acknowledged that the officers did not display an intimidating or coercive demeanor"); *Sanchez*, 89 F.3d at 718 (listing as a factor indicating involuntariness the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory").[12] Also, while multiple officers were present, there is no evidence in the record that their combined presence was obviously "threatening" or otherwise coercive. *See United States v. Jones*, 701 F.3d 1300, 1314 (10th Cir. 2012) (finding that "while there were three officers on the scene, the testimony presented . . . indicated that the officers' presence was non-threatening"). Plaintiff even testified that her interaction with Defendant Carpenter was "professional and pleasant."

The Court cannot conclude that the unlawfulness of Defendants' conduct would have been "apparent" to a reasonable officer. *See Ziglar*, 137 S. Ct. at 1867. In other words, Plaintiff has failed to demonstrate that "it would have been clear to a reasonable officer that the alleged conduct"—relying on Plaintiff's acquiescence to transport and question her at the station—"was unlawful in the situation he confronted" that night in front of Plaintiff's home. *See Id.* Thus, the Court holds that Defendants Carpenter, Weir, and Checketts—the officers present at the time of the purported consent—are entitled to qualified immunity from Plaintiff's false arrest claims and summary judgment thereon. *See Cox*, 800 F.3d at 1247 (explaining that because plaintiff had failed to present case law clearly establishing the right in question, "we could hold that [she] has not properly laid the groundwork to defeat [the officer's] assertion of qualified immunity").

---

[12] Plaintiff insists that Defendant Carpenter's pleasant manner was a tactic to minimize her resistance to transportation, but she provides no support for this characterization other than her fervent belief that the officers on scene intended to transport her against her will regardless of her consent. As explained above, there is no evidence in the record that suggests that any of the Defendants intended to transport or question Plaintiff against her will. More to the point, the Fourth Amendment requires an objective evaluation, making the subjective intent of Defendant Carpenter irrelevant.

**B. DEFENDANTS REAVES, SUBE, CRAGUN, TARWATER, YOUNG, GONNUSCIO, GOFF, PLEDGER, WHITEHEAD, AND WINDSOR**

Plaintiff also contends that, at separate intervals, several officers (Defendants Windsor, Pledger, Goff, and Reaves[13]) ordered or requested that Plaintiff be removed from the scene and thereby caused or facilitated her allegedly unconstitutional transportation to the police station for additional questioning. Plaintiff further asserts that several other officers (Defendants Gonnuscio, Young, Tarwater, Cragun, Whitehead, and Sube) were aware of the plan to transport Plaintiff from the scene and interview her at the police station and either facilitated the plan or failed to intervene to prevent it. Thus, Plaintiff argues that each of these defendants is liable under § 1983 either because they facilitated, ordered, or failed to intervene to prevent Plaintiff's trip to the police station and the additional questioning she experienced there.

Each of these defendants has raised qualified immunity as a defense. Were the Court to impute Defendants Carpenter, Weir, and Checketts' actions to other defendants, Plaintiff's argument would fail for the same reason the Court has already explained above. However, in the context of § 1983 actions, "each officer, to the extent that liability exists, is only responsible for his own actions." *Jones v. Norton*, 3 F. Supp. 3d 1170, 1187 n.48 (D. Utah 2014). "[I]n each instance, the focus must always be on the *defendant*—on the force *he* used or caused to be used, on the injury *he* inflicted or caused to be inflicted, and on *his* motives." *Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010). In other words, "[l]iability under § 1983 . . . and defendants' entitlement to qualified immunity[] turn on an individual assessment of each defendant's conduct *and culpability*." *Pahls v. Thomas*, 718 F.3d 1210, 1233 (10th Cir. 2013) (emphasis added).

---

[13] Plaintiff also claims that these defendants failed to intervene. The following analysis regarding their knowledge of a potential constitutional violation is applicable to both the claims for direct liability under § 1983 and the separate claims for failure to intervene.

Therefore, "in all cases, a plaintiff must show that *each defendant acted with the requisite state of mind*." *Id.* at 1226 (emphasis added).

### 1. Supervisory Liability

For supervisory liability to lie under § 1983, state of mind is key. *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (explaining that, to succeed on a supervisory liability claim under Section 1983, a plaintiff must demonstrate that the supervisor "acted with the state of mind required to establish the alleged constitutional deprivation"); *Kemp v. Lawyer*, 846 F. Supp. 2d 1170, 1175 (D. Colo. 2012) (explaining that "the Tenth Circuit has clarified that to establish a violation of Section 1983 by a supervisor, the plaintiff must, at minimum, establish a deliberate and intentional act on the part of the defendant to violate the plaintiff's rights"). Moreover, a plaintiff invoking a theory of supervisory liability must establish a "causal connection" between the supervisor's conduct and the alleged constitutional violation, which means that a plaintiff must show that "the defendant [supervisor] set in motion a series of events that the defendant [supervisor] *knew or reasonably should have known* would cause others to deprive the plaintiff of her constitutional rights." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013). At a minimum, "the plaintiff must establish a deliberate, intentional act on the part of the [particular] defendant to violate the plaintiff's legal rights." *Porro*, 624 F.3d at 1327–28 (internal quotation marks and alterations omitted).

### 2. Duty to Intervene

The Tenth Circuit has indicated that law enforcement officials have "an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers *in their presence*." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008) (emphasis added) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)); *accord Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1433 (10th Cir. 1984) (explaining

that police officers may not be liable "merely because he was present at the scene of a constitutional violation, . . . [but] he may be liable if *had the opportunity to intervene* but failed to do so" (emphasis added)), *judgement vacated on other grounds by City of Lawton, Okla. v. Lusby*, 474 U.S. 805 (1985). Thus, an officer is only "liable for the preventable harm caused by the actions of . . . other officers where that officer *observes or has reason to know*" that a constitutional violation is occurring or is about to occur. *See Vondrak*, 535 F.3d at 1210 (emphasis added); *accord Jones*, 3 F. Supp. 3d at 1196 (explaining that "[a]n officer is liable under Section 1983 for failure to intervene if he *knows* a constitutional violation [wa]s being committed" and finding that the defendants had no reason to know that an arrestee's rights were being violated (emphasis added) (internal quotation marks omitted)).

### 3. Analysis

Here, Plaintiff's conduct demonstrates that she was not transported against her will. Even if she had been, Plaintiff has failed to show that Defendants Reaves, Sube, Cragun, Tarwater, Young, Gonnuscio, Goff, Pledger, Whitehead, or Windsor knew or had reason to know that Plaintiff would be transported *against her will*. Plaintiff has shown that these Defendants knew of the plan to transport her from the scene and that none of these Defendants had any reason to believe that Plaintiff had committed an offense warranting a custodial arrest. Indeed, each individual officer indisputably had some working knowledge of the plan to remove the witnesses from the scene and each likely knew that these were *witnesses*, not arrestees. But this knowledge, even supported by favorable inferences drawn from the record, is insufficient to conclude that these officers knew or had reason to know that Plaintiff would be transported in violation of her Fourth Amendment rights.

Nevertheless, Plaintiff insists that each Defendant knew of a surety that she would be transported to the station against her will because that was their plan from the start. The lynchpin

of Plaintiff's argument is her theory that the CS gas attack on her home and subsequent clearing operation by SWAT members was deliberately coordinated with her removal from the scene. Plaintiff provides three pieces of evidence to support this theory: (1) At 4:41am, Defendant Weir radioed to Defendant Checketts the following: "Hey Kory, we're good for the moment, so whatever you guys gotta do," which Plaintiff insists was a veiled signal to Defendant Checketts to cease questioning so that Plaintiff could be transported and the SWAT operation could begin; (2) Plaintiff arrived at the police station three minutes before the SWAT operation began (meaning she was removed from the scene approximately ten minutes before the operation began); and (3) Defendant Goff's questioning of Plaintiff at the police station ended approximately five minutes after the house was secured by the SWAT team. Based on these facts, Plaintiff asks this Court to infer that her removal from the scene was a necessary prerequisite to the planned SWAT operation and an essential component of the officers' plan. Plaintiff theorizes that each of the False Arrest Defendants knew that she *had* to be removed from the scene and, by extension, that no deference would be given to her desire to stay or her refusal to be transported. In this way, each of the False Arrest Defendants—from those who requested her removal to those who simply overheard that it would occur—allegedly knew that she would be transported against her will in violation of the Fourth Amendment and either affirmatively acted to facilitate it or failed to intervene to stop it.

This theory of events is neither supported by the record nor reasonably inferred therefrom. None of the evidence cited by Plaintiff supports the assertion that her removal was necessary in order for the SWAT operation to occur or that any defendant knew that Plaintiff was to be transported against her will. Plaintiff's evidence of "coordination" between her removal and the SWAT operation shows that the two events occurred at similar intervals but does nothing

to indicate that Plaintiff's removal was deliberately planned so that the SWAT operation could begin. And, without more, the purported "signal" from Defendant Weir (a liaison for the SWAT command) to Defendant Checketts (a detective tasked with overseeing witnesses) can only be read as an indication that the SWAT command no longer needed Plaintiff's assistance at the scene and that she was free to be transported. It does not suggest that Defendant Weir, with a nod and wink, was opaquely signaling that Plaintiff's transport was necessary for the SWAT operation to proceed. In the end, Plaintiff's theory is entirely circular—police had a nefarious purpose because they acted nefariously, and they acted nefariously because they had a nefarious purpose.

Furthermore, the idea that Plaintiff had to be removed to allow the SWAT operation to proceed makes little sense as a practical matter. There is nothing Plaintiff could have done or said to stop the SWAT team's breach of her home. No reasonable officer would have allowed Plaintiff to roam about the scene unsupervised such that she could directly interfere with any plans laid by the SWAT team or other officers. And even if she had some opportunity to physically interfere with those plans, she could have been appropriately restrained by any of the number of officers present. Moreover, assuming the breach was justified, her consent was not necessary to allow the SWAT operation to proceed. And even if the breach lacked appropriate justification, there is no indication in the record that any amount of protest from the backseat of a patrol car could have reversed the decisions to deploy CS gas and breach the garage door once they were made.[14]

---

[14] With this conclusion in mind, Plaintiff's allegations that certain officers' objectively pleasant discussions with her were nothing more than "schmoozing and confusing" tactics employed to "minimize her resistance" to removal from the scene becomes untenable. Given the analysis above, the Court is left to wonder what possible advantage False Arrest Defendants would gain from such an elaborate game of deceit and trickery.

Based on the foregoing, the Court concludes that Plaintiff's assertion regarding the deliberate coordination of her removal is not appropriately supported in the record and is ultimately untenable. With this conceptual lynchpin removed, the whole structure of Plaintiff's theory of liability for Defendants Reaves, Sube, Cragun, Tarwater, Young, Gonnuscio, Goff,[15] Pledger, Whitehead,[16] and Windsor crumbles. Without this purported conspiracy to have Plaintiff removed to allow the SWAT operation to proceed, there is no evidence in the record or

---

[15] Plaintiff makes a great deal of the fact that Defendant Goff testified that he was not sure "if [Plaintiff] said yes or no" to being transported to the police station for additional questioning. Although it appears from the record that Defendant Goff at some point requested that Plaintiff and the other witnesses be removed from the scene to give formal statements at the police station, there is no indication that he demanded that it occur with or without voluntary consent. Moreover, there is no evidence that he handled or otherwise coordinated Plaintiff's removal. Instead, Defendant Goff testified that he believed that "Detective Checketts and other people with bigger badges than me" coordinated the removal or arranged for it to occur. Thus, there is no indication in the record that Defendant Goff had reason to know that Plaintiff would be transported with or without her consent.

Most importantly, the record indicates that Defendant Goff *assumed* that Plaintiff was voluntarily at the police station for questioning—he began the interview by saying, "I just want you to understand that you're here voluntarily to explain to me what happened tonight." Plaintiff insists that this statement was merely a tactic meant to confuse her as to her rights, but, in light of the analysis and evidence discussed above, the Court can find no support for such a characterization.

[16] Defendant Whitehead specifically testified that he had a

> distinct impression that [the officers who directed him to transport Plaintiff to the police station] either felt they had the legal means to facilitate taking [Plaintiff] down there [to the police station] or she was going down there on her own accord or she was going down there to simply take shelter and filter these things out until this unfolded because she didn't have a house to go to.

The Tenth Circuit has explained that "a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable." *Stearns v. Clarkson*, 615 F.3d 1278, 1286 (10th Cir. 2010). The Court finds that the evidence Plaintiff has adduced does nothing to contradict Defendant Whitehead's testimony or otherwise demonstrate that his reliance on the conclusions of his fellow officers was in any way unreasonable.

Additionally, the Court notes that, although Plaintiff alleges otherwise, she has provided no evidence that Defendant Whitehead knew that the CS gas attack was imminent or transported Plaintiff to the station with the express purpose of facilitating that attack. The only support Plaintiff can muster for that allegation is Defendant Whitehead's general presence at the scene and testimony that he might have "speculated that [the standoff] would have turned into" a SWAT assault based on prior experience. This is plainly insufficient to establish any reasonable inference of collaboration between Defendant Whitehead and the SWAT team to effectuate their attack on the home. In fact, Plaintiff fails to acknowledge several crucial lines of Defendant Whitehead's testimony:

> I had no information about any of their plans [regarding the CS gas attack]. I certainly would have speculated that it probably would have turned into that but I had no absolute knowledge, no. Anything that I knew that they would be doing would simply be speculation because I've done this job for a while and I've seen the mechanics of how it typically plays out, but as far as hearing anybody say, 'This is the plan we're going to do,' I had no knowledge.

Plaintiff has not pointed to any evidence that would controvert this testimony.

reasonable inference to be drawn therefrom that any of these officers knew or had reason to know that Plaintiff was to be transported against her will to the police station. *See Porro*, 624 F.3d at 1327 ("Though Mr. Porro says that [the officer] knew [other officers] 'planned' to taser him and assented to it, this claim is . . . based on innuendo and speculation rather than fact."); *Savannah v. Collins*, 547 F. App'x 874, 876 (10th Cir. 2013) (unpublished) (indicating that an officer cannot be held liable "merely because he was present at the scene of a constitutional violation" because there must be some "realistic opportunity to intervene to prevent the harm from occurring"). Moreover, the Court is not aware of any authority that would require these officers to proactively confirm that the transportation of Plaintiff from the scene and her subsequent questioning at the police station were in accordance with constitutional principles in the absence of any reasonable inkling of potential illegality. *See Stearns*, 615 F.3d at 1286 ("When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists.").

In sum, whether framed as supervisory liability or failure to intervene, there is no basis for holding any of these officers liable for any constitutional violation that they did not know would occur or could not reasonably predict would occur. *See Martinez v. Carson*, 697 F.3d 1252, 1255 (10th Cir. 2012) (explaining that an individual officer "causes [a citizen] to be subjected . . . to the deprivation of [a constitutional right]" and is therefore liable under § 1983 where the officer "knew or reasonably should have known" his actions "would cause others to deprive" a plaintiff of her constitutional rights). Consequently, Defendants Reaves, Sube, Cragun, Tarwater, Young, Gonnuscio, Goff, Pledger, Whitehead, and Windsor are entitled to qualified immunity and summary judgment on Plaintiff's § 1983 claims for false arrest.

## C. DEFENDANTS ASHMENT AND THOMPSON

Plaintiff also brings claims against Defendants Ashment and Thompson for false arrest under § 1983 based on a modified theory of supervisory liability. She alleges that those defendants "promulgated, created, implemented or possessed responsibility for . . . the policy of unlawfully seizing witnesses not suspected of having committed any offense." ECF No. 206 at 69. Plaintiff's claims stemming from the alleged "Transportation Policy" are two-fold: either (1) these Defendants "implemented a policy so deficient that the policy itself is a repudiation of constitutional rights" or (2) these Defendants acted with deliberate indifference to potential constitutional violations stemming from the Transportation Policy. ECF No. 206, at 69–70. The Court concludes that neither form of Plaintiff's claim can survive summary judgment and both Defendants are entitled to qualified immunity.

Both forms of Plaintiff's supervisory liability claim against Defendants Ashment and Thompson fail for a simple reason: Plaintiff has not established that either officer acted with the requisite mental state for a violation of § 1983 under a theory of supervisory liability. *See Wilson v. Montano*, 715 F.3d 847, 858 (10th Cir. 2013) (explaining that "the plaintiff must establish, at minimum, a deliberate and intentional act on the part of the supervisor to violate the plaintiff's legal rights"). Plaintiff has not established or even alleged any other instances of potential constitutional violations stemming from the Transportation Policy that would put either officer on notice that the policy was constitutionally deficient. *Cf. Wilson*, 715 F.3d at 858 (finding that allegations of "numerous prior occasions in which individuals . . . were subject to prolonged warrantless detention" was sufficient to support a claim of deliberate indifference by supervisor); *Connick v. Thompson*, 131 S. Ct. 1350 (2011) ("A pattern of similar constitutional violation by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train [claims]."); *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (explaining

that in order to prove that a supervisor "implemented a policy so deficient that the policy itself is a repudiation of constitutional rights[,]" the plaintiff must demonstrate that the supervisor knew that the policy was so deficient as to be unconstitutional and further holding that "a constitutionally deficient policy cannot be inferred from a single wrongful act"); *Kemp*, 846 F. Supp. 2d at 1177 (dismissing a claim of supervisory liability where "the complaint only speculate[d] that . . . [subordinate] officers must have engaged in warrantless searches and seizures, prior to th[e] incident here, because of the egregiousness of the [officers'] actions"). In fact, both Defendant Ashment and Defendant Thompson expressly testified that they had no knowledge of any such violations resulting from the Policy. ECF No. 207-1, at 14–15 (Defendant Ashment testifies, "I can't think of a situation where—that I'm aware of or that I've been involved in where I've taken a witness to the station without their consent if they were considered to be a witness."); ECF No. 208-1, at 125 (Defendant Thompson testifies, "I can't think of a circumstance[] where that's happened."). This evidence, uncontroverted by actual instances of previous violations resulting from the Policy, undermines any allegation of deliberate indifference by Defendants Ashment or Defendant Thompson.

Plaintiff appears to assert that the Policy itself was to transport witnesses involuntarily and therefore Defendant Ashment and Defendant Thompson knowingly facilitated an unconstitutional policy. However, Plaintiff has not adduced any evidence that would support such an assertion. The mere fact that Defendants Ashment and Thompson testified that it was hypothetically *possible* for witnesses to be transported without voluntary consent as part of the Transportation Policy is not enough to demonstrate that the Policy itself required or authorized such conduct. Nor is it enough to indicate that they were deliberately indifferent to routine or even occasional constitutional violations resulting therefrom. Defendant Ashment testified that

he would "certainly be okay with" transportation of witnesses without voluntary consent only "if under the judgment of those interviewers [present at the scene] it seemed to make sense to do that." This testimony cannot be reasonably construed as an admission that the Policy required or otherwise authorized unconstitutional conduct. Defendant Ashment explicitly stated that he personally would defer to the professional judgment of individual officers on the ground when responding to the hypothetical possibility that a witness could be transported against her will to the police station. This does nothing to indicate that the Transportation Policy itself required or authorized unlawful conduct.[17] In short, Plaintiff has adduced no evidence that the Policy contained any such facial requirement or authorization of involuntary transport and questioning or that it was otherwise understood that the Policy encouraged transport with or without consent. Thus, Plaintiff has not adequately demonstrated or alleged that Defendants Ashment and Thompson acted knowingly by enforcing or facilitating the Transportation Policy.

In sum, because Plaintiff has failed to demonstrate or properly allege the requisite state of mind for supervisory liability under § 1983, the Court concludes that Defendant Ashment and Defendant Thompson are entitled to qualified immunity and Plaintiff's claims against them in their individual capacities fail.

### D. MUNICIPAL DEFENDANTS

Finally, Plaintiff brings claims for false arrest under § 1983 against Defendants Ogden City, Weber County, and Defendants Ashment, Thompson, and Smith in their official capacities, under a theory of municipal liability. For a plaintiff to hold a municipality (or a municipal actor in their official capacity) liable under § 1983, she must demonstrate three essential elements: (1)

---

[17] Moreover, Defendant Ashment's testimony simply cannot be reasonably construed as an admission that he would readily approve of or otherwise be "okay with" transporting witnesses without *any* legal justification. The only reasonable reading of his testimony is that, under certain hypothetical circumstances, it could be possible for officers to justify the transportation of a witness even in the absence of voluntary consent.

the existence of an official policy or custom; (2) that the official policy or custom caused her injuries; and (3) that the municipal actor or municipal decisionmakers acted with the requisite state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769–771 (10th Cir. 2013). Where a municipal policy or custom is facially or otherwise inherently unlawful, "issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). But, where "the policy at issue is lawful on its face and the municipality therefore has not directly inflicted the injury through its own actions," a more "rigorous standard[] of culpability and causation must be applied." *Id.* (internal quotation marks omitted). In all cases, the plaintiff "must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Schneider*, 717 F.3d at 770.

Additionally, in the absence of an established official policy or custom, "a municipality can be liable where 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 773 (quoting *City of Canton Ohio v. Harris*, 489 U.S. 378, 390 (1989)). But this avenue of liability also requires proof that "a municipal actor disregarded a known or obvious consequence of his action"—*i.e.*, that he was deliberately indifferent "to the rights of persons" who interact with his untrained employees. *Connick*, 563 U.S. at 61. The *Connick* Court explained that

> [a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. . . . Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.

*Id.* at 62 (internal quotation marks omitted).

Here, Plaintiff characterizes the Transportation Policy as a requirement that witnesses to officer-involved shootings be transported to the police station without fail—even in the absence of voluntary consent. Plaintiff goes so far as to allege that the Policy required or otherwise encouraged tactical confusion of witnesses as to their rights and current legal status "to minimize their resistance to being transported to the police station." ECF No. 206, at 59–60. The evidence presented does not bear this characterization out in any respect. As an initial matter, while the actual written document outlining procedures and protocol for officer-involved shootings does not differentiate between witnesses and suspects, it does not expressly require or otherwise authorize transportation of non-suspect witnesses without their consent. In fact, the document requires that the investigation "follow the rules of law which apply to all criminal proceedings including constitutional, statutory, and case law regarding rights which are covered by the United States Constitution's 4th, 5th, 6th, and 14th Amendments." ECF No. 210-1, at 47.

Even assuming that the Transportation Policy existed independently of the written protocol document, there is no evidence that the Policy, as it allegedly prevailed in these jurisdictions for two decades, required or otherwise authorized transportation of witnesses without consent or without any other legal justification. Defendant Carpenter characterized the Policy as follows: "From my understanding, witnesses that don't resist voluntary statements are taken to the station where statements are taken." Defendant Ashment testified that "it's fairly standard to ask a witness if they would—if they would give a statement or come to the station to give a statement" and indicating that he could not "think of a situation" involving the Transportation Policy where a witness was taken to the station without first being asked to consent. Plaintiff has not come forward with any evidence to contradict this testimony or the characterizations contained therein. At best, the evidence cited by Plaintiff establishes that it was

policy—or at least an entrenched preference—that witnesses to officer-involved shootings give formal statements at the police station rather than at the scene and that officers would typically transport those witnesses to the station for that purpose. Nothing in the testimony that Plaintiff has cited suggests that the Policy required *every* witness to be interviewed at the police station regardless of circumstance. In fact, Defendant Ashment testified that the "standard procedure for dealing with witnesses to an officer involved shooting" is "they would be interviewed, if possible." Nor does it establish that witnesses were to be transported and interviewed whether they liked it or not. Thus, Plaintiff has failed to establish that the Transportation Policy facially or otherwise violated constitutional rights.

Moreover, as described previously, Plaintiff has failed to establish any persistent or even incidental "pattern of similar constitutional violations by untrained employees" that would put these municipalities on notice that the Transportation Policy itself or training based thereon was so deficient as to be constitutionally suspect. Indeed, Plaintiff has failed to demonstrate that the policy was anything other than what Defendant Carpenter or Defendant Ashment testified that it was—a preference for formal interviews at the station by consenting or otherwise legally detained witnesses. Plaintiff herself was asked point-blank if a trip to the station for further questioning would be "all right."

In short, even if the Court were to assume that Plaintiff had demonstrated both the existence of an official policy or custom and a causal link between that policy and her alleged injury, Plaintiff has failed to demonstrate "deliberate indifference" on the part of any municipal actor relating to the Transportation Policy. Accordingly, Ogden City, Weber County, and Defendants Ashment, Thompson, and Smith are entitled to summary judgment regarding Plaintiff's claims against them under § 1983 for false arrest.

## VI. EXCESSIVE FORCE CLAIMS UNDER § 1983

Plaintiff has also moved for summary judgment regarding her claims of excessive force under § 1983 against Defendants Reaves, Sube, Cragun, Tarwater, Young, Checketts, Goff, Gonnuscio, Pledger, Windsor, Weir, Whitehead, and Carpenter, as well as against municipal Defendants Ogden City and Weber County. The relevant defendants have all filed cross-motions for summary judgment on the same claims, and the individual defendants have invoked qualified immunity as a defense. As explained below, the Court concludes that no constitutional violation occurred, and therefore all individual defendants are entitled to qualified immunity and summary judgment. Moreover, all municipal defendants are entitled to summary judgment.

Common sense dictates that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Still, in order to be lawful, the physical coercion or force used to effectuate a detention must be reasonable under the Fourth Amendment.[18] *See id.* at 395 ("[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). "Thus, the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir. 2007).

Under this Fourth Amendment reasonableness standard, police officers are generally permitted "to use more force in making an arrest than in effecting an investigative detention." *Id.*

---

[18] As both parties appear to agree that Plaintiff's excessive force claims are actionable only under the Fourth Amendment, the Court evaluates Plaintiff's claims under that amendment. *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) ("Any force used leading up to an including an arrest may be actionable under the Fourth Amendment's prohibition against unreasonable seizures." (internal quotation marks and alterations omitted)).

Nevertheless, certain circumstances may warrant the use of a higher level of force, even when the same circumstances would not warrant a full custodial arrest. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994); *United States v. Perdue*, 8 F.3d 1455, 1463–64 (10th Cir. 1993). Specifically, where potential threats to officer safety are present during an investigative detention, police officers may "take steps to protect their personal safety and maintain the status quo." *Cortez*, 478 F.3d at 1130. Thus, "law enforcement may (1) display some force, (2) place suspects on the ground, (3) use handcuffs, or (4) detain suspects in law enforcement vehicles, even in the absence of probable cause." *Id.* (citing *Perdue*, 8 F.3d at 1463). Still, any force employed by officers to effectuate such a detention must be reasonably proportional to the threat that the detainee poses to the officer's safety or to the status quo at the scene. *See id.* at 1131. In other words, it must be apparent that "the facts available to the officer would 'warrant a man of reasonable caution in the belief' that the action taken was appropriate." *United States v. King*, 990 F.2d 1552, 1562 (10th Cir. 1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). The Court must evaluate "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

The Supreme Court in *Graham* identified three factors for consideration in evaluating the objective reasonableness of a particular use of force: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Additionally, in evaluating these factors, the Court is mindful that

> not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense,

uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97. Thus, courts "do not require [police officers] to use the least intrusive means in the course of a detention, only reasonable ones." *Melendez-Garcia*, 28 F.3d at 1052 (citing *King*, 990 F.2d at 1562–63). This approach allows courts to "avoid 'unrealistic second-guessing' of police officers' decisions." *Id.*

## A. DEFENDANT WHITEHEAD

Plaintiff claims that Defendant Whitehead used excessive force in effectuating her initial detention. As explained below, the Court concludes that Defendant Whitehead is entitled to qualified immunity from such claims and summary judgment in his favor is therefore appropriate.

Defendant Whitehead arrived on the scene shortly after receiving the "SHOTS FIRED" alert from dispatch. Defendant Reaves shouted to Defendant Whitehead to secure Plaintiff and Lansky who were crouching or kneeling in the front yard because Defendant Reaves did not "know what their involvement [was]." Defendant Whitehead then ordered Plaintiff and Lansky to get on the ground and to go "face down." In deposition testimony, Plaintiff asserted that she was confused by the wording because she was already low to the ground, and, as a result, she did not comply with the order. She testified that when she failed to lay face down as instructed, Defendant Whitehead took her by the shoulders, turned her around, and forced her onto her stomach so that she was lying face down in the street. She also asserted that he applied enough pressure to her back to keep her pinned to the ground as he placed the handcuffs on her wrists:

> **Q [Counsel]:** Did he ask you to put your hands behind your back or anything like that?
> **A [Plaintiff]:** I think so.
> **Q:** Do you remember complying with that?
> **A:** Yes.
> **Q:** You don't remember having to be forced to do that?

**A:** No.

**Q:** Do you recall if at that point [Defendant Whitehead] was standing over the top of you?

**A:** He must have been. I felt like he was holding me down somehow. I felt like maybe that was his foot on my back while he was handcuffing me.

**Q:** OK. But you don't know?

**A:** No.

**Q:** Could have been his other hand, a foot, elbow, could have been anything but you felt like something was keeping you down?

**A:** Yes.

Defendant Whitehead then helped Plaintiff to her feet, walked her to his cruiser, and placed her in the back seat. Plaintiff sat in the backseat for approximately twenty-five minutes until another officer retrieved Defendant Whitehead's keys and removed the handcuffs from Plaintiff's wrists. From that point, Plaintiff remained in the backseat until Defendant Whitehead drove her from the scene and dropped her off at the Ogden City police station to be interviewed.

Plaintiff seems to concede that her initial restraint in handcuffs and detention in Defendant Whitehead's cruiser was lawful, and such a concession is consistent with controlling law. *See, e.g.*, *Fisher v. City of Las Cruces*, 584 F.3d 888, 894 (10th Cir. 2009) ("[I]n nearly every situation where an arrest is authorized, or police reasonably believe public safety requires physical restraint, handcuffing is appropriate."). Nevertheless, Plaintiff alleges that Defendant Whitehead used excessive force in effectuating that otherwise proper detention because (1) he turned her around and forced her from a kneeling position onto her stomach and placed pressure on her back as he brought her arms behind her back and clicked the handcuffs on her wrists, and (2) he detained her in his cruiser beyond the time necessary for the purposes of the initial detention and transported her to the police station for questioning.

Defendant Whitehead responds that he is entitled to qualified immunity as a matter of law. When "officers move for qualified immunity on an excessive force claim, a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that

objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007). The Court concludes that Plaintiff's excessive force claims against Defendant Whitehead cannot survive evaluation under a qualified immunity standard because she has failed to demonstrate that her constitutional rights were violated by Defendant Whitehead's use of force.

## 1. Excessive Force Standard

In instances "where the handcuffing is permissible yet the *manner* of handcuffing may render the application of force excessive," courts evaluate the non-exhaustive factors articulated in *Graham* and supplement their evaluation with "an examination of the resulting injury" in order to determine the reasonableness of the force applied. *See Fisher*, 584 F.3d at 896–97. As a prelude to these evaluations, the Court notes that the Tenth Circuit has repeatedly indicated that a police officer may place individuals on the ground as part of an investigative detention prompted by potential danger to the officer's safety. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). Such a position allows the officer to better view the subject and "prevents [the subject] from obtaining weapons which might have been . . . on his person." *Id*. The Court also reiterates that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396–97. Thus, the Court need not determine whether Defendant Whitehead's conduct was *necessary* under the circumstances, only whether it was *reasonable*. *See Melendez-Garcia*, 28 F.3d at 1052. And the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. These principles inform the Court's evaluation of the totality of the circumstances, including "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of

the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (alterations added and in original).

## 2. Defendant Whitehead's Conduct

Plaintiff argues that Defendant Whitehead used excessive physical force by "pushing Plaintiff to the pavement on her stomach and . . . by putting his weight into her back" as he placed the handcuffs on her wrists. ECF No. 255, at 83. Plaintiff asserts without significant elaboration that Defendant Whitehead did not *need* to force her into a prone position or apply pressure to her back in order to properly handcuff her. Instead, because she was already kneeling, Plaintiff argues that Defendant Whitehead could have simply grabbed her forearms and placed the handcuffs on her wrists. The Court rejects Plaintiff's arguments. The particular level of force Defendant Whitehead used to secure Plaintiff in handcuffs—including forcing her to the ground and applying pressure to her back as he placed the handcuffs on her wrists—was plainly reasonable as a matter of law given the undisputed circumstances.

The Court finds that the first *Graham* factor weighs heavily in favor of the level of force employed by Defendant Whitehead. The crime at issue—the violent assault and attempted murder of police officers—was clearly severe. Although Plaintiff was not at all involved in these crimes, Defendant Whitehead was not aware of this when he arrived on the scene. In fact, he was quickly instructed by another officer to secure both Plaintiff and Lansky because the other officer could not account for their involvement in the shooting that had just taken place. The possibility that Plaintiff was somehow involved in the violent altercation at issue weighs in favor of Defendant Whitehead's use of force to secure Plaintiff in handcuffs. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (finding that because the detainee had at most committed a misdemeanor, such as disorderly conduct, "the amount of force used should have been reduced accordingly").

As to the second *Graham* factor, there was ample reason to believe that Plaintiff was a potential threat to officer safety. Plaintiff protests that Defendant Whitehead had no reason to believe she posed any threat to him or to other officers. In particular, Plaintiff makes a great deal of the fact that Defendant Whitehead was responding to a dispatch call that identified a single gun*man* located *inside* the home, not a gun*woman* standing *outside* the home. Further, Plaintiff asserts that she was kneeling, clearly distraught, and not obviously aggressive or armed. Plaintiff reasons that Defendant Whitehead therefore knew that she did not pose any threat when he encountered her and placed her in handcuffs. But these arguments are unavailing.

Here, the mere fact that Defendant Whitehead was responding to an ongoing confrontation with an armed suspect who had just minutes before fired on police is sufficient to justify his concern for his own safety and that of other officers on scene. *Terry*, 392 U.S. at 27 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."). In order to countenance Plaintiff's reasoning, the Court would be required to assume that the dispatch transmission in this case was somehow a definitive and unalterable description of conditions on the ground rather than a second- or third-hand recounting of information intermittently conveyed by officers regrouping from a firefight. And even assuming the dispatcher's recounting was totally accurate at the time of the call, it is indisputable that conditions on the scene of an ongoing standoff can change rapidly and drastically as previously unknown dangers are encountered or new actors arrive on scene. In such circumstances, it is plain that a reasonably prudent officer arriving on scene with limited information would be justified in assuming that any unidentified or unaccounted for individuals were potential threats.

And, even more important here, regardless of the accuracy of the dispatch call, the dash-cam recording of Defendant Whitehead's arrival shows that he was almost immediately instructed by another officer to "[g]et these people secured! I don't know what their involvement is!" Thus, whatever Defendant Whitehead was told by dispatch, an officer *already present on the scene* instructed him to secure Plaintiff and Lansky because that officer could not account for their involvement in the earlier shooting. This is more than enough to create an objectively reasonable suspicion of potential threat in the mind of an officer arriving on the scene.[19] *Stearns*, 615 F.3d at 1286 ("When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists.").[20]

Even when viewed in the light most favorable to Plaintiff's case, circumstances justified Defendant Whitehead's order to Plaintiff to get down on the ground in a prone position. *See Perdue*, 8 F.3d at 1463 (finding officers were justified in ordering potentially armed suspects to the ground "as a means of neutralizing the potential danger"). And although it is clear that Plaintiff did not *actively* resist detention or attempt to flee (the third *Graham* factor), it is

---

[19] Plaintiff insists that the other officer had not personally observed any threatening behavior by Plaintiff and that he likely only intended her to be detained until the scene was secure. ECF No. 255, at 25. The objective observations and subjective intent of the other officer are irrelevant to this Court's analysis of Defendant Whitehead's conduct, as none of this information was available to him when he arrived on scene. *See Fisher*, 584 F.3d at 895 ("We take seriously the admonition that we must judge the amount of force from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." (internal quotation marks omitted)). By the same token, not even Defendant Whitehead's own subjective sense of what danger Plaintiff actually posed matters in this inquiry. All that matters is that a reasonable officer in the position of Defendant Whitehead would be justified in concluding that Plaintiff was a potential threat. Based on the analysis above and below, the Court concludes that a reasonable officer would be so justified.

[20] The Court also notes that Defendant Whitehead's decision to place Plaintiff in a prone position helped ensure Plaintiff's safety. Plaintiff seems to forget that the reason she was outside in the cold and dark, kneeling and distraught, is because just minutes earlier, her fiancé had come charging up the stairs, firing wildly at police with a handgun. Defendant Whitehead heard the "SHOTS FIRED" alert and knew there was a gunman in the building. In the event that the gunman determined to fire out the front door, Plaintiff was safer prone than kneeling—and safer still in the back of the police cruiser than out in the open.

undisputed that Plaintiff did not comply with Defendant Whitehead's orders to lay face down on the ground as he approached. Because Plaintiff could reasonably be believed to pose a threat to Defendant Whitehead and his fellow officers, her failure to comply with repeated lawful orders to lay face down on the ground reasonably justified additional force to ensure her compliance. *See Fisher*, 584 F.3d at 896 (indicating that refusal to cooperate with officer's orders is an "important factor in finding the officer's use of force . . . reasonable"). The Court further notes that a review of audio of the encounter indicates that the force applied to Plaintiff's person was momentary and incidental, lasting no longer than was necessary to secure the handcuffs (several seconds at most). In sum, the bulk of the *Graham* factors and additional important factors weigh decidedly against a finding that the level of force employed by Defendant Whitehead was excessive given the undisputed circumstances.[21]

Having applied the *Graham* factors, the Court supplements its evaluation of the force at issue with "an examination of the resulting injury." *Id.* at 896–97. The Tenth Circuit "requires a showing in a handcuffing case of an actual, non-*de minimis* physical, emotional, or dignitary

---

[21] Plaintiff cites two cases, *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008), and *Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001), for the proposition that the application of pressure to an individual's back when that individual is in a prone position is *per se* excessive force. Plaintiff's reliance on these cases is misplaced in at least two ways. First, the cases do not stand for the proposition that Plaintiff asserts. The court in *Weigel* found that it was constitutionally unreasonable for officers to apply pressure to an individual's "upper back[] once he was handcuffed and his legs restrained" for nearly three minutes "due to the significant risk of positional asphyxiation associated with such actions." 544 F.3d at 1155. The essence of the holding in *Weigel* is "that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 544 F.3d at 1155 (internal quotation marks omitted). *Cruz* dealt exclusively with so-called hog-tying of arrestees and held that "tying the decedent's arms behind his back, binding his ankles together, securing his ankles to his wrists, and then placing him face down on the ground" was constitutionally unreasonable because of the clear risk of positional asphyxia. *See* 239 F.3d at 1188–89. Neither of these cases held that *any* application of pressure to an individual's back when they are face down on the ground is *per se* excessive force, as Plaintiff seems to argue. Second, these cases are plainly distinguishable from Plaintiff's experience with Defendant Whitehead. The conduct at issue in *Weigel* involved the application of sustained pressure to the individual's back over the course of nearly three minutes *after* the individual was fully restrained and "after it was clear that the pressure was unnecessary to restrain him." 544 F.3d at 1152. By contrast, the pressure applied to Plaintiff's back here occurred *while* Plaintiff was being handcuffed, did not extend past the time it took to secure the handcuffs, and lasted no more than a four to five seconds overall. And, in contrast to the conduct at issue in *Cruz*, there is no evidence in the record here to suggest that Plaintiff was hog-tied or otherwise left in a prone position for more than a few seconds. The excessive conduct at issue in *Weigel* and *Cruz* is simply not comparable to the plainly incidental application of force at issue here.

injury to succeed on a claim" of excessive force. *Id.* at 899. That is, Plaintiff must have suffered something beyond what is normally entailed in the ordinary course of handcuffing. *See id.* at 900 (indicating that "fleeting discomfort from handcuffing, or red marks or swelling that disappear in a few hours or days" are normally incident to handcuffing and not supportive of an excessive force claim).

Here, Plaintiff has failed to provide any facts suggesting that the force used by Defendant Whitehead to handcuff her was physically injurious in any way. In fact, Plaintiff admits that she suffered no physical injuries. Plaintiff testified that Defendant Whitehead "grab[bed] me and turn[ed] me around and put me on my stomach," and did not describe any pain or physical injury resulting from this motion. Moreover, it is not apparent from her testimony that the force applied was any greater than necessary to force Plaintiff to comply with the order to go face-down on the ground. Likewise, Plaintiff only described the force applied to her back as pressure sufficient to keep her on the ground, and did not describe it as painful or otherwise injurious. Thus, Plaintiff's testimony indicates that the application of force was little more than incidental to the handcuffing.

Further, there is simply no indication in the record, and no argument in Plaintiff's briefing, that any alleged emotional injury stemmed from Defendant Whitehead's momentary application of non-injurious physical force to place her in handcuffs. Though the Court does not doubt that being forcibly placed face-down on the street and then handcuffed is distressing, "not every indignity—even if it may later seem unnecessary in the peace of a judge's chambers—rises to the level of a constitutional violation." *Silvan W. v. Briggs*, 309 F. App'x 216, 225 (10th Cir. 2009) (unpublished) (internal quotation marks omitted). And, while Plaintiff has asserted generally that she was traumatized by the events of that night, she has not pointed to any

evidence in the record that would indicate that the particular force at issue—*i.e.*, the force used to push Plaintiff into a prone position and the pressure applied to her back as Defendant Whitehead secured the handcuffs—had anything more than a *de minimis* impact on the overall emotional or dignitary injuries she allegedly suffered. *Cf. Maresca v. Bernalillo County*, 804 F.3d 1301, 1315 (10th Cir. 2015) (explaining that, in the context of an excessive force claim against officers who had pointed their guns at children during an incident, evidence that the children had repeatedly expressed concerns about being shot by police, a fear of police, and nightmares ostensibly regarding the incident was sufficient to show a non-*de minimis* psychological or emotional injury). Like the factors outlined previously, the lack of any apparent non-*de minimis* physical, emotional, or dignitary injury also tips in favor of a finding that the level of force employed by Defendant Whitehead to handcuff Plaintiff was reasonable and not excessive for Fourth Amendment purposes.

All told, the objective facts provided by Plaintiff, even when taken in the light most favorable to her claims, do not suggest that the level of force employed by Defendant Whitehead to secure Plaintiff in handcuffs was excessive. And no reasonable jury could conclude that the physical force at issue amounted to a constitutional violation. Because, even in "the light most favorable to the party asserting the injury," Defendant Whitehead's conduct did not constitute a constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Therefore, Defendant Whitehead is entitled to qualified immunity from Plaintiff's claims of excessive force related to her initial detention and handcuffing.

### B. DEFENDANT FUHR AND MUNICIPAL DEFENDANTS

Plaintiff also brings claims against Defendant Fuhr, Defendant Whitehead's superior at the Utah Highway Patrol, in his individual capacity for failure to train or otherwise supervise

Defendant Whitehead's conduct. Defendant Fuhr has moved for summary judgment on these claims. Since Plaintiff has failed to demonstrate that Defendant Whitehead committed an underlying constitutional violation, her claim against Defendant Fuhr for failure to train or supervise must also fail. Her claims against municipal defendants fail for the same reason. *See Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) ("Our conclusion [that no underlying constitutional violation occurred] precludes a § 1983 action against the remaining [municipal] defendants.").

## C. REMAINING INDIVIDUAL DEFENDANTS

Next, Plaintiff asserts that each of the remaining individual defendants employed, caused to be employed, or failed to intervene to prevent the use of excessive force by other officers—specifically the force used to detain her at the scene and to transport her for questioning at the police station. ECF No. 206, at 54. Citing *Cortez v. McCauley*, Plaintiff asserts that "[p]hysical contact is not required for an excessive force claim—patently unreasonable conduct is." 478 F.3d 1108, 1131 (10th Cir. 2007); *see also id.* at 1125–26 ("[T]he interests protected by the Fourth Amendment are not confined to the right to be secure against physical harm; they include liberty, property, and privacy interests—a person's sense of security and individual dignity."). Plaintiff further asserts that her detention in a cruiser and subsequent transportation to the police station for additional detention and questioning was in violation of her constitutional rights and amounted to "patently unreasonable conduct" under *Cortez*.[22] ECF No. 255, at 88.

---

[22] Plaintiff also seems to argue that all of the False Arrest Defendants were involved in a broad-based conspiracy to deprive her of her rights under the Fourth Amendment. As explained above, the Court can find no support in the record for such an argument. More importantly, Plaintiff forgets that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force." *Graham*, 490 U.S. at 397. As the inquiry in an excessive force claim is entirely objective, Plaintiff's claims of subjective conspiratorial intent are ultimately irrelevant to the reasonableness of any use of force.

The difficulty with Plaintiff's arguments is that they focus on facts that could give rise to a claim for unlawful arrest but not an additional claim for excessive force. The Tenth Circuit has explained:

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest but not an additional claim for excessive force.

*Id.* at 1126. In other words,

> [i]f the amount of force used would have been reasonable to affect an arrest *if an arrest had been justified*, the damages for excessive force are subsumed within the damages for unlawful arrest. *It is only when the force was excessive as compared to the execution of a lawful arrest that a plaintiff can recover on both claims.*

*Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1211 (D.N.M. 2010) (emphasis added). "Thus, the excessive force inquiry evaluates the use of force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." *Cortez*, 478 F.3d at 1126.

Here, Plaintiff essentially claims that she was subjected to excessive force because she was unlawfully detained in a police cruiser and transported against her will to the police station. But such a claim of excessive force is clearly foreclosed by the Tenth Circuit's reasoning as outlined above. Even assuming that detention of Plaintiff in the police cruiser and subsequent transportation to the police station were unlawful, Plaintiff has not pointed to any evidence that would indicate that these actions involved any more force "than would have been reasonably necessary if the . . . detention [and transportation] were warranted." *See Cortez*, 478 F.3d at 1126; *cf. Fisher*, 584 F.3d at 893–94 (explaining that a plaintiff is only entitled to damages resulting from excessive force only "[i]f the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest").

After the handcuffs were removed, Plaintiff was not subject to any restraint beyond the lock on the cruiser door and the intermittent presence of multiple police officers. Such restraint is easily justified by the circumstances the officers faced at the time. *See Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."); *Cortez*, 478 F.3d at 1131 (explaining that there must be some specific, articulable justification "for [particular] uses of force during an investigative detention, such as locking a person in a police car"). It strains credulity to insist that any officer was required to turn Plaintiff out into the cold and allow her to wander into the police milieu surrounding an active standoff with an armed, severely intoxicated suspect who had already fired at police. Keeping Plaintiff in a locked cruiser while she remained at the scene was appropriate to maintain the status quo and otherwise protect officer, bystander, and Plaintiff's own safety. *See United States v. Hensley*, 469 U.S. 221, 235 (1985) (explaining that officers are entitled to take such steps as necessary to "protect their personal safety and maintain the status quo"); *Summers*, 452 U.S. at 702–03 ("The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."). Thus, unlike the detention in *Cortez*, the conduct at issue here—keeping Plaintiff in the backseat of a locked patrol car, without handcuffs—involved no more force than would have been reasonably necessary to effect a lawful detention under the circumstances.

Similarly, the act of transporting Plaintiff to the police station and there questioning her in an interview room are potentially indicative of a false arrest claim, but not of an excessive force claim. While these acts could be indicative of a potentially unlawful seizure, *see Dunaway v. New York*, 442 U.S. 200, 212–13 (1979) (holding that a seizure approximating an arrest, involving placement in the back of a patrol car and transportation to the police station for

interrogation, without probable cause violates the Fourth Amendment), Plaintiff has adduced no evidence that the officers used any "more force than would have been reasonably necessary if the arrest or the detention were warranted," *Cortez*, 478 F.3d at 1126. Indeed, the conduct that is at issue under this aspect of Plaintiff's excessive force claim is identical to her claim for false arrest. Summarily labeling such conduct as "patently unreasonable" does nothing to distinguish the conduct from any potentially false arrest.

Thus, even assuming Plaintiff's version of the facts and viewing the supportable evidence in the light most favorable to her case, Plaintiff's claim for excessive force related to her detention and transportation cannot survive summary judgment. *See id.* at 1129 ("We hold that the force established does not exceed what would have been reasonable to effectuate a lawful arrest under these circumstances. Therefore, whether or not the arrest was lawful, Plaintiffs' claim that Defendants used excess force against Rick Cortez should not survive summary judgment."). In other words, there was no violation of Plaintiff's constitutional right to be free of excessive force, and each defendant is entitled to qualified immunity from Plaintiff's claims of excessive force under § 1983.

## VII.    WARRANTLESS ENTRY CLAIMS UNDER § 1983

Plaintiff has moved for summary judgment against Defendants Cragun, Johansen, Tarwater, Young, Jackman, Checketts, Goff, Gonnuscio, Pledger, Windsor, Clawson, Perez, Weir, Whitehead, and Carpenter, arguing that the undisputed facts show that these defendants violated her constitutional rights by entering her home without a warrant or otherwise facilitating the warrantless entry. Each defendant has filed a cross-motion for summary judgment on Plaintiff's warrantless entry claims and has raised the defense of qualified immunity. Because the Court concludes that no constitutional violation occurred even under a favorable reading of

Plaintiff's version of events, each defendant is entitled to qualified immunity and summary judgment.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). "Even an arrest warrant does not give police carte blanche to enter any dwelling in search of the object of the warrant; while such a warrant permits entry into the suspect's residence to effectuate an arrest, entry into a third party's home for the same purpose requires a search warrant." *Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011) (citing *Steagald v. United States*, 451 U.S. 204, 222 (1981))*; see also United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) ("Absent exigent circumstances, the firm line at the entrance of the house may not reasonably be crossed without a warrant."). But, "[p]robable cause accompanied by exigent circumstances will excuse the absence of a warrant." *Howard v. Dickerson*, 34 F.3d 978, 982 (10th Cir. 1994) (citations omitted); *see also Mascorro*, 656 F.3d at 1205 ("If, however, police have probable cause for an arrest, the existence of certain exigent circumstances may overcome the presumption of unreasonableness that attaches to all warrantless home entries.").

Plaintiff does not dispute that officers had probable cause to arrest Collier. Accordingly, the over 300 pages of briefing on these events boil down to one question: Did the circumstances preceding the introduction of CS gas into Plaintiff's home constitute an exigency?

An exigent circumstance sufficient to justify warrantless entry of a home consists of three "basic aspects[:]"

> (1) [T]he law enforcement officers must have reasonable grounds to believe that there is immediate need to protect their lives or others or their property or that of others, (2) the search must not be motivated by an intent to arrest and seize evidence, and (3) there must be some reasonable basis, approaching probable cause, to associate an emergency with the area or place to be searched.

*United States v. Davis*, 290 F.3d 1239, 1242 (10th Cir. 2002) (quoting *United States v. Smith*,

797 F.2d 836, 840 (10th Cir. 1986)). Courts are to determine the existence of an exigent

circumstance justifying warrantless entry by "evaluating the circumstances as they would have

appeared to prudent, cautious, and trained officers at the time." *Thomas*, 372 F.3d at 1177;

*accord Porter*, 594 F.3d at 1256 ("The test is whether the circumstances, viewed objectively,

justify the action; the officer's subjective motivation is irrelevant." (internal quotation marks and

brackets omitted)). In other words, the existence of an exigency "ultimately depends on the

unique facts of [the] controversy," *United States v. Wicks*, 995 F.2d 964, 970 (10th Cir. 1993),

and courts must therefore be "guided by the realities of the situation presented by the record,"

*Davis*, 290 F.3d at 1243. Here, the only aspect of the exigent circumstances exception outlined in

*Davis* that is in dispute is the first: whether officers on the scene had "reasonable grounds to

believe that there is immediate need to protect their lives or others."[23] *See id.* at 1242.

It is undisputed that the officers that responded to the initial domestic violence call were

admitted into the home by Plaintiff to speak with Collier. When Collier, without provocation,

fired seven rounds into the kitchen, the officers retreated out of the home into the front yard. It

cannot be reasonably disputed that reasonable officers in that position would have been legally

justified in reentering the home to apprehend or disable Collier. There was a clear exigency at

that moment: the danger posed by Collier's violent and unprovoked behavior. Plaintiff does not

appear to dispute this point. Instead, she argues that, as a matter of law, the original exigency

faded and disappeared by the time Defendant Pledger ordered the introduction of CS gas into the

home and the breach of the front door. The Court disagrees. As explained below, the exigency

---

[23] It does not appear to the Court that Plaintiff has argued either that the officers were motivated by an intent to "arrest and seize evidence" or that they had no "reasonable basis, approaching probable cause, to associate an emergency with" her home. *See Davis*, 290 F.3d at 1242. And rightly so. There is no evidence that officers on the ground that night were intent on seizing evidence and there was abundant cause to believe that the epicenter of any danger was Plaintiff's home.

that existed in the firsts tense moments after the initial retreat did not dissipate until Collier was found dead in the basement.

The initial encounter between Collier and responding officers established the following objective facts: (1) Collier was armed with at least one firearm; (2) he was willing to use that firearm against police and anyone in their vicinity; and (3) he was willing to kill or maim without any provocation or advance warning. These objective facts would lead any "prudent, cautious, and trained officer[]" to conclude that Collier was a concrete, immediate danger to others. *Thomas*, 372 F.3d at 1177. Moreover, Defendant Pledger and officers were subsequently informed that Collier had threatened suicide and reported severe injuries but refused to seek medical help. Indeed, Plaintiff expressed that Collier may kill himself should police reenter the home. This additional information would lead any reasonable officer to conclude that Collier was not only an immediate danger to others, but also to himself. Defendant Pledger and other officers also learned that Collier was "heavily intoxicated" and that his fiancée had described his behavior throughout the night as aggressive and entirely out-of-character. Coupled with the unprovoked nature of his initial attack on officers and his expression of suicidal intent, a "prudent, cautious, and trained officer[]" could readily conclude from this information that Collier's behavior was not likely to be governed by logic, reason, or any sense of self-preservation. *See Thomas*, 372 F.3d at 1177; *Bing ex rel. Bing v. City of Whitehall*, 456 F.3d 555, 564 (6th Cir. 2006) ("[P]eople in the street reported that Bing appeared intoxicated, making it reasonable to expect that he would act unstably."). And now, Collier was barricaded in the home with access to at least one weapon. Such circumstances constitute an obvious exigency—with Collier armed, unstable, and now cornered in the home, there was "immediate need to protect"

the lives of officers on the scene, those of Plaintiff and her guests outside, and Collier's as well. *Davis*, 290 F.3d at 1242.

Nevertheless, Plaintiff argues that the danger posed by Collier was neither "immediate" nor "concrete" as the standoff progressed to two-and-a-half hours. ECF No. 249, at 3. The Court again disagrees. "Exigent circumstances terminate when the factors creating the exigency are negated." *Bing*, 456 F.3d at 565. As noted above, the factors creating the exigency here are legion, and none of them were negated by the passage of time or any other information that became available to officers throughout the standoff. Even after more than an hour of negotiations, Collier was patently uncooperative with negotiators and the third-party intermediary, refusing to disarm, surrender, disclose the extent of his injuries, or even reveal his location in the home. The mere fact that Collier did not directly threaten anyone or yell out of the home at anyone does not indicate that he was no longer armed, or that he was thinking rationally, or that he could not at any time fire upon officers or take his own life.[24] In short, as far as "prudent, cautious, and trained officers" on the scene knew, Collier was armed,[25] violent, and

---

[24] Plaintiff emphasizes the testimony of Defendant Pledger that marksmen did not shoot Collier dead when he appeared at windows or doors because "he clearly wasn't a threat to someone other than himself. Now he might have remained a potential threat to his own life . . . but he was not a threat to any of my people or anyone other than himself at those points." Plaintiff insists that this testimony indicates that no exigency existed during the standoff. ECF No. 201, at 69 n.101. Once more, the evaluation of any purported exigency is not dependent on the opinions of the individual officers involved. *See Thomas*, 372 F.3d at 1177; *cf. Bing*, 456 F.3d at 567 ("The extreme level of danger that requires police to mount an immediate invasion with weapons drawn cannot serve as the floor for establishing a dangerous exigency. 'Immediate danger' cannot require 'immediate invasion,' no matter what one police officer's deposition says."). Moreover, Plaintiff's citation to this testimony as some evidence of a lack of exigency conflates the standard by which an officer decides to employ lethal force and the standard by which an officer determines the existence of a concrete, immediate emergency. In Plaintiff's view, until Collier was obviously inviting a bullet from a marksman's gun, he was not a concrete, immediate danger. As the Court's analysis should make clear, "[t]his position is not compelled by the Fourth Amendment." *See Bing*, 456 F.3d at 567. The "harm to others" exigent circumstances exception itself—which allows officers to act to protect their own lives or that of others by entering a home—requires that officers be able to *prevent* such escalation from occurring in the first place. *See Brigham City v. Stuart*, 547 U.S. 398, 406 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties.").

[25] Officers who had observed Collier through windows or doorways could not see whether or not he still had his weapon. This does not definitively demonstrate that he was unarmed. Moreover, officers knew that Collier had access to the weapon, even if it was not visibly at his fingertips.

unpredictable. *See Thomas*, 372 F.3d at 1177; s*ee also United States v. Stewart*, 867 F.2d 581, 584 (10th Cir. 1989) (explaining that the existence of an exigency justifying warrantless entry "hinges on the facts within [the officers'] knowledge indicating exigency"). At any given moment during the standoff, Collier could have reached out a window or a door and fired on officers or turned the weapon on himself. *See Bing*, 456 F.3d at 564 ("[T]he police could see Bing move from room to room, demonstrating that police and bystanders were probably within range of Bing's gun."). No facts adduced by Plaintiff give any indication of an objective change in these circumstances over the two-and-a-half hours in which Collier was barricaded in the home. Instead, the undisputed facts and even Plaintiff's version of events indicate that Collier "posed a continuous immediate danger" to the officers on the scene and to himself. *See id.* at 565.

In fact, by the time Defendant Pledger and other officers considered breaching the home with CS gas, the situation had deteriorated and the circumstances had grown more exigent. Officers had been stationed in frigid temperatures nearly as long as Collier had been holed up in Plaintiff's home. Each moment that passed made them less ready and less able to respond to any violent action by Collier. More importantly, however, negotiators had determined that Collier was "less willing to speak with negotiators, to the point of hanging up on both negotiators and [Jamie] and then refusing to answer the phone." Though Collier would speak to Jamie at times, he was not making any apparent efforts toward any particular outcome. Thus, the officers' original tack—positive negotiation efforts meant to draw Collier out of the home—ran against Collier's intoxicated and irrational refusal to comply with any requests to peacefully surrender. There was, as Defendant Pledger put it, no "indication that negotiations were successful" and "no progress being made" toward an abatement of any of the conditions that brought police to the

scene in the first place. Collier had neither surrendered his weapon nor shown any indication of compliance or a desire to peacefully end the standoff. In short, by the time the officers determined that breach of the home was necessary to the final breach of the front door, there was no information indicating that Collier was anything other than armed, unpredictable, and intent on harming himself or officers. Until officers discovered Collier's lifeless body in the basement, a reasonable officer would have concluded that there were "real immediate and serious consequences" to any delay. *See Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984).

Plaintiff nonetheless insists that officers had time to procure a warrant electronically. She points to the electronic warrant sought by Defendant Checketts for the subsequent home search and argues that the officers "had the immediate means and time to request a search warrant from a magistrate." ECF No. 201, at 70. This argument is unavailing. As an initial matter, there is little support in the record for the proposition that there was ample time to both request and secure a warrant from a magistrate. *See United States v. Cuaron*, 700 F.2d 582, 589 (10th Cir. 1983) ("Although warrants obtained by telephone generally take less time to procure than traditional warrants, the time required for a telephone warrant varies from case to case."). Despite Plaintiff's suggestion that the warrant procedure was "immediate," Defendant Checketts expressly testified that the process was not so simple.

More to the point, Plaintiff's argument that officers could have procured a warrant is just another way of saying that there was no immediate need to enter the home. The Court has already determined that there was such a need and therefore a warrant was unnecessary. *See Howard*, 34 F.3d at 982; *Cuaron*, 700 F.2d at 589 ("The exigencies of some situations will prevent the officers from obtaining even a telephone warrant."). From the time that Defendant Pledger and other officers formulated the entry plan, eight minutes passed before the plan was in

effect and gas canisters had breached the home. Based on the circumstances facing the officers that night, the Court can readily conclude that "the critical nature of the circumstances clearly prevented the effective use of *any* warrant procedure." *Id.* at 589; *see also United States v. Hicks*, 389 F.3d 514, 528 (10th Cir. 2004) ("In light of the fact that the police believed Hicks was armed, had just killed a police officer, and did not want to be captured, exigent circumstances existed and the SWAT team had no reason to delay entry into Hick's house once it was ready to act.").

Because the officers involved had probable cause to arrest Collier and a reasonable basis to conclude that there was an immediate need to prevent further violent conduct by Collier, there was no need to obtain a warrant in order to enter Plaintiff's home. The breach of Plaintiff's home by police—whether by gas canisters or a battering ram—was therefore not a violation of her constitutional rights. As a result, all individual defendants are entitled to qualified immunity from Plaintiff's claims relating to the warrantless entry of her home. Moreover, without an underlying constitutional violation, Plaintiff's claims for warrantless entry under § 1983 against all defendants must fail.

## VIII.   SUBSTANTIVE DUE PROCESS CLAIMS

Plaintiff maintains that, in part, her First and Sixth Causes of Action "seek relief under § 1983 for oppressive conscious-shocking actions" that constitute violations of Plaintiff's substantive due process rights.

The Supreme Court has "emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (internal quotation marks omitted). Consequently, "due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities." *Id.* at 846 (citations omitted). In cases dealing with alleged abusive

executive action (as is the case here), "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)). Therefore, to offend substantive due process, executive conduct must be so egregious that it "'shocks the conscience' and violates the 'decencies of civilized conduct.'" *Id.* (quoting *Rochin v. California*, 342 U.S. 165, 172–73 (1952)); *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002) (The standard for determining whether there has been a substantive due process violation is "whether the challenged government action shocks the conscience of federal judges.") (internal quotation marks omitted).

This is a tremendous burden. "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). "Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." *DeAnzona v. City and County of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000).

"Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." *Pena v. Greffet,* 922 F. Supp. 2d 1187, 1227 (citing *James v. Chavez,* 830 F.Supp.2d 1208, 1276 (D.N.M. 2011), *aff'd,* 511 Fed. App'x 742 (10th Cir. 2013)).

Viewing the facts in the light most favorable to the Plaintiff, none of Defendants' actions were sufficiently egregious to shock the conscience. On the contrary, it appears from the record that Defendants conducted themselves with commendable professionalism and courtesy and in accordance with the laws of our country. Therefore, Plaintiff's claims for violations of substantive due process must fail.

# IX.     PLAINTIFF'S STATE LAW CLAIMS

The Court has dismissed or granted summary judgment on all of Plaintiff's federal claims. "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156. Therefore, the Court dismisses Plaintiff's state law claims without prejudice.

# X.     ORDER

1. Plaintiff's Motion for Partial Summary Judgment Against Home Search Defendants (ECF No. 201) is **DENIED.**

2. Plaintiff's Motion for Partial Summary Judgment Against False Arrest Defendants (ECF No. 206) is **DENIED.**

3. Ogden City Defendants' Cross Motion for Summary Judgment (ECF No. 238) is **GRANTED.**

4. Weber County Defendants' Cross Motions for Summary Judgment (ECF Nos. 235, 244) are **GRANTED.**

5. Weber County Defendants' Motion to Dismiss Plaintiff's § 1983 procedural due process claims and Fifth Amendment Takings claims (ECF No. 227) is **GRANTED**, and those claims are **DISMISSED WITHOUT PREJUDICE.**

6. Defendants Bryce Weir and Armando Perez's Cross Motion for Summary Judgment (ECF No. 245) is **GRANTED.**

7. State Defendants' Motion for Summary Judgment (ECF No. 220) is **GRANTED AS TO PLAINTIFF'S FEDERAL LAW CLAIMS**.

8. Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE.**

9. The Clerk of Court is directed to close the case.

SO ORDERED September 26, 2017.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge